UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| **FIDDLER, GONZALEZ &** **RODRIGUEZ, PSC** | **CASE NO. 17-03403 (MCF)** |
| | **CHAPTER 7** |
| Debtor | |
| **NOREEN WISCOVITCH-RENTAS, as** Chapter 7 Trustee of the Debtor, **FIDDLER,  GONZALEZ  &** **RODRIGUEZ, PSC,** | **ADVERSARY PROCEEDING NO.: 19-00327** |
| v. | |
| **PEDRO J. MANZANO,[1] ET ALS.** | |
| Defendant | |

## MOTION TO DISMISS

**TO THE HONORABLE COURT:**

COME NOW, defendants Pedro J. Manzano and the alleged conjugal partnership with Ms. Carmen Juarbe, and Jose A. Silva Cofresí and the alleged conjugal partnership with Ms. Janet Navarrete, (hereinafter jointly referred to as defendants "Manzano and Silva Cofresí"), without submitting to the jurisdiction of this Honorable Court, through the undersigned attorneys and very respectfully STATE and PRAY as follows:

**I.      INTRODUCTION**

On May 14, 2019, plaintiff, the Chapter 7 Trustee (hereinafter referred to as "Trustee") filed the above captioned adversary proceeding (Docket 1).

---

[1]      Incorrectly identified in the Complaint as "Pedro A. Manzano Yates" instead of Pedro J. Manzano Yates.

1

At the outset, it must be stated that this Complaint was filed by the Trustee and her counsel in bad faith and with the sole intent of obtaining access to the proceeds from the Executive Advantage Policy, commonly known as the "Officers & Directors Insurance Policy", funds of the Debtor, by harassing defendants, damaging their reputation and tarnishing their personal and professional image within the legal community.[2]  Importantly, prior to the filing of the Complaint the Trustee and her counsel were provided through written letters and the depositions taken with sufficient evidence that contradict and disprove every single allegation contained in the Complaint, specifically those having to do with the alleged breach of fiduciary duties of defendants Manzano and Silva Cofresí, which is the backbone claim of this spurious Complaint.

Notwithstanding, the Complaint contains fifteen (15) causes of action requesting damages under different theories and claims, including, avoidance of transfers, turnover of funds and relief against conjugal partnerships.  Specifically, the Complaint contains the following claims:

I.     Violation of Automatic Stay by Liberty -Not Related to the appearing defendants;

II.    Negligent and/or Fraudulent Misrepresentation Against Defendant Liberty- Non-Core Matter- Not Related to the appearing defendants;

III.   Breach of Contract Against Defendant Liberty- Non-Core Matter- Not Related to the appearing defendants;

IV.    Breach of Duty of Good Faith and Fair Dealing Against Defendant Liberty- Non-Core Matter- Not Related to the appearing defendants;

V.     Declaratory Judgment Against Defendant Liberty- Non-Core Matter- Not Related to the appearing defendants;

---

[2]     The appearing defendants do not waive their right to claim attorneys' fees and costs or to bring a Rule 11 action, if necessary.

VI.      Insurance Brokerage Negligence Against Defendant AON – Non-Core
         Matter- Not Related to the appearing defendants;

VII.     Breach of Fiduciary Duty Against Defendant AON- Non-Core Matter- Not
         Related to the appearing defendants;

VIII.    Breach of Fiduciary Duty Against Manzano and Liberty – Non-Core
         Matter;

IX.      Breach of Fiduciary Duty Against the Manzano Group Defendants and
         Liberty – Non-Core Matter;

X.       Breach of Fiduciary Duty Against the Close Out Group and Liberty – not
         related to the appearing and a Non-Core Matter;

XI.      Action to Avoid Avoidable Transfers-Core Matter, but fails to state a
         claim;

XII.     Rescission of Transfers State Law Basis – Non-Core Matter;

XIII.    Objection to Claims -Dependent on Non-Core Matters;

XIV.     Subordination of claims- Dependent on Non-Core Matters; and

XV.      Relief Against Conjugal Partners and Partnerships—Non-Core Matter.

Co-defendants Manzano and Silva Cofresí herein move to dismiss the Complaint filed
against them for various reasons.

**First**, this Court lacks subject matter jurisdiction to entertain the Trustee's claims for relief
in Counts II, III, IV, V, VI, VII, VIII, IX, X, XII, XIII, XIV and XV of the Complaint, outlined
above, inasmuch as: *(i)* they are based on state law claims; *(ii)* such claims for relief are "non-
core" and do not "arise under" Title 11 nor "arise in" the bankruptcy case nor are they "related to"

3

the bankruptcy case; *(iii)* diversity jurisdiction does not exist; and *(iv)* such claims do not involve a federal question.

**Second**, this court should abstain from entertaining Trustee's claims for relief in Counts II, III, IV, VI, V, VII, VIII, IX, X, XII and XV of the Complaint, outlined above, as all the requirements for abstention are met in this case, namely, such claims (which are state law claims) could have been filed in state court and, in such forum, the action would be adjudicated in a timely manner.

**Third**, the Trustee has failed to state a claim upon which relief may be granted. The Complaint in this case is plagued with vague allegations against co-defendants Manzano and Silva Cofresí that fail to meet the pleading and specificity standard required under Bell Atlantic Corp. v. Twombly, 550 U.S. 544, (2007) and Ashcroft v. Iqbal, 556 U.S. 662, (2009) and fail to support a reasonable inference that co-defendants are liable for the misconduct alleged.

**Fourth**, the Trustee failed to include several defendants in the complaint who are indispensable parties, including the General Administrator of the Debtor (the person responsible for all financial reporting, budgets and payments made as part of the day to-day administration of the Debtor and the person who had the control over the financial information of the Debtor), the Board of Directors of the Debtor, and the Shareholders of the Debtor all of whom are necessary for adjudication of the Complaint.

**Fifth**, the Complaint fails to state a claim as to the "breach of fiduciary duty" claim. Trustee not only failed to state with any specificity that co-defendants Manzano and Silva-Cofresí were grossly negligent or lacked good faith, pursuant to the standard established in In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959, 967-71 (Del. Ch. 1996), but also she failed to

demonstrate that the co-defendants acted in bad faith and against their informed business judgment.

**Sixth**, the Complaint fails to state a claim as to the "Preference" cause of action. The salary and/or compensation-based payments made to co-defendants Manzano and Silva Cofresí by the Debtor were not antecedent debts and, instead, were "substantially contemporaneous exchanges" as defined by 11 U.S.C. §§ 547(c)(1)(A)—(B). Moreover, the challenged employment-related payments were "made in the ordinary course of the debtor's and transferee's business or financial affairs;" or "made according to ordinary business terms" as provided by 11 U.S.C. §§ 547(c)(2)(A)—(B).

For the reasons further expounded below, the Court must dismiss the Complaint against defendants Manzano and Silva-Cofresí with prejudice.

## II.   MEMORANDUM OF LAW

### A.   STANDARD FOR DISMISSAL

Federal Rule of Civil Procedure ("Fed.R.Civ.P") 12 applies to bankruptcy proceedings through Federal Rule of Bankruptcy Procedure 7012. The purpose of a motion to dismiss under Fed.R.Civ.P. 12(b)(6) is to assess the legal feasibility of a complaint, not to weigh the evidence which the plaintiff offers or intends to offer. *See*, Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2nd Cir.1984); Citibank, N.A. v. K–H Corp., 745 F.Supp. 899, 902 (S.D.N.Y.1990); Wright & Miller, Federal Practice and Procedure: Civil 3d § 1356 (2013) "Although detailed factual allegations are not required, the Rule does call for sufficient factual matter". Surita Acosta v. Reparto Saman Inc. (In re Surita Acosta), 464 B.R. 86, 90 (Bankr. D.P.R. 2012). Therefore, to survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, a complaint must

contain sufficient factual matter that, accepted as true, "state[s] a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).

It is hornbook law that there is a two-step analysis when considering motions to dismiss under Fed. R. Civ. P. 12(b)(6). *See*, Schatz v. Republican State Leadership Committee, 669 F.3d 50, 55 (1st Cir.2012). "Step one: isolate legal conclusions. Step two: take the complaint's well-pleaded (non-conclusory) allegations as true, drawing all reasonable inferences in favor of the plaintiff and determine if they plausibly narrate a claim for relief." In re: Hotel Airport, Inc., 2014 LEXIS 3990 (Bankr. DPR 2014), *citing* Shatz, *supra* and also Carrero–Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 719–720 (1st Cir. 2014) (applying the two-step standard for established in Schatz.

## B.   THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

A bankruptcy court has the authority to determine whether it has subject matter jurisdiction over an adversary proceeding. In re MPC Computers, LLC, 465 B.R. 384, 386 (Bankr. D. Del. 2012). Rule 12(b)(1) of the Federal Rules of Civil Procedure provides that a federal court may dismiss a complaint for lack of subject matter jurisdiction. A motion to dismiss under Rule 12(b)(1) challenges the power of the federal court to hear a claim or case. Democracy Rising PA v. Celluci, 603 F. Supp. 2d 780, (M.D. Pa. 2009). Courts may consider subject matter jurisdiction at any time and must dismiss an action if subject matter jurisdiction is lacking. Fed. R. Civ. P. 12(h)(3). The issue can be raised in any manner, including on motion of one of the parties or by the court *sua sponte*. In re Eltech, Inc., 313 B.R. 659, 662 (Bankr. W.D. Pa. 2004).

In a Rule 12(b)(1) motion to dismiss, the party invoking the federal court's jurisdiction bears the burden of establishing that the court has jurisdiction. *See, e.g.*, Common Cause of Pa. v.

6

Pa., 558 F.3d 249, 257 (3d Cir. 2009). Subject matter jurisdiction is governed by *28 U.S.C. § 1334* provides, in relevant part:

> (a) Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.
>
> (b) ...Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11.

This section provides the bankruptcy court with three different jurisdictional bases: *(i)* all cases filed "under" 11 U.S.C., *(ii)* all proceedings "arising under" 11 U.S.C. and, *(iii)* all proceedings "arising in" or "related to" 11 U.S.C. A case filed "under" Title 11 is the bankruptcy petition itself. In re Marcus Hook Dev. Park Inc., 943 F.2d 261, 264 (3d Cir. 1991).

Proceedings "arising under" Title 11 refer to those proceedings within the bankruptcy case itself that may raise a litigated matter. In re Wolverine Radio Co., Inc., 930 F.2d 1132, (6th Cir. 1991). "Arising under" proceedings encompass actions based on any express provision of the Bankruptcy Code; for example, a sale of assets under Section 363 of the Bankruptcy Code. These are also identified as "core matters".

Proceedings "arising in" a case under Title 11 refer to proceedings that are not based on any right expressly created by Title 11, but nevertheless would have no existence outside the bankruptcy case. In re Repository Techs., Inc., 601 F.3d 710, (7th Cir. 2010). These are "core" proceedings related to the administration of a bankruptcy case itself.

On the other hand, proceedings "related to" a case under Title 11, or "non-core" matters constitute "the broader universe of all proceedings that are not core proceedings but are nevertheless 'related to' a bankruptcy case." Halper v. Halper, 164 F.3d 830 (3d Cir. 1999).

"Related to" jurisdiction gives the bankruptcy court the power to hear proceedings that do not fall under Title 11 and that could exist independently of the bankruptcy case, **only when there is a close nexus between the proceeding and the underlying bankruptcy case**. However, such "related to" jurisdiction is not unlimited. There must be a nexus between the "related" proceeding and the bankruptcy case, such that **"the outcome of the litigation potentially could have some effect on the existence of the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate."** In re Boston Reg'l Med. Ctr., 410 F.3d 100, (1st Cir.2005). The test for "related to" jurisdiction is whether "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." In re Exide Techs., 544 F.3d 196, (3d Cir. 2008) (*citing* Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984).

The Court lacks subject matter jurisdiction to entertain this complaint under any of the three tiers of jurisdiction provided by 28 USC 1334.

> ### i.     *There is no "Arising Under" Jurisdiction for Trustee's Claims Under Counts II, III, IV, V, VI, VII, VIII, IX, X, XI, XII and XV of the Complaint.*

A matter "arises under" the Bankruptcy Code if its existence depends on a substantive provision of bankruptcy law and it involves a cause of action created or determined by a statutory provision of the Bankruptcy Code. In re Ray, 624 F.3d 1124, (9th Cir. 2010).

A simple review of Plaintiff's own allegations in the Complaint demonstrates that there is no "arising under" jurisdiction to entertain Counts II, III, IV, V, VI, VII, VIII, IX, X, XI, XII and XV as asserted in the complaint, as they are clearly "non-core" matters that arise *exclusively* under the Civil Code of Puerto Rico and not from any substantive provision of the Bankruptcy Code.

The only claims which are "arising under" the Bankruptcy Code are the claims under Counts I (Solely Against Liberty), Count V (Solely against Liberty), Count XI (Avoidance Actions), Court XIII (Objection to Claims) and XIV (Subordination of Claims).

From these five (5) causes of action, three counts, *i.e.* Counts V, XIII and XIV are interdependent and conditioned on the Trustee's ability to prevail in the state law "non-core" claims. There are only two (2) counts of the Complaint that are "core" matters and independent from the "none-core" causes of action, namely; Count I for violation of stay against Liberty, which is a claim unrelated to defendants Manzano and Silva Cofresí, and Count XI, which is an avoidance claim related to the salary and compensation agreed to by Debtor with defendants Manzano and Silva Cofresí for their services and for which Trustee fails to state in her pleadings a claim for which a remedy may be granted. It should be noted that these two last "core matters" are wholly dependent on the outcome of the non-core causes of action, since the basis to object to the claims of the Defendants (Cause XIII) and subordinate the same (Cause XIV) are based on the same facts that are being alleged in the non-core causes of action.

### ii. There is no "Arising In" Jurisdiction for Claims Under Counts II, III, IV, V, VI, VII, VIII, IX, X, XI, XII and XV.

The Honorable Court also lacks "arising in" jurisdiction for entertaining the Complaint. Courts have stated that, while "the meaning of "arising in" bankruptcy proceedings is less clear, the term is a reference to those 'administrative' matters that arise only in bankruptcy cases. In other words, "arising in" proceedings are those that are not based on any right expressly created by Title 11, but that would not exist outside of the bankruptcy case. In re Wood, 825 F.2d 90 (5th Cir. 1987).

Trustee's claims stem from alleged pre-petition actions by defendants Manzano and Silva Cofresí and not administrative matters that were caused by or arose from the filing of this

9

bankruptcy petition. On the contrary, these claims could have been brought in a non-bankruptcy forum long before the filing of the bankruptcy proceeding, but the Debtor, through its Board of Directors chose not to do so. This was specifically asked by counsel for the Trustee during the depositions taken prior to the filing of the Complaint. **Exhibits 1**[3] **and 2**[4]**.** Thus, there is clearly no "arising in" jurisdiction for such claims.

   *iii.*   ***There is No "Related to" Jurisdiction for the Claims in the Complaint.***

   The third tier of jurisdiction under 28 USC 1334, refers to whether it could be inferred that the claims are "related to" the subject Chapter 11 proceeding pending before the Honorable Court. A civil proceeding is "related to" a bankruptcy case when "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy". Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984). The key word in this tier is "conceivable." Bankruptcy jurisdiction will exist so long as it is possible *that a proceeding may impact "the debtor's rights, liabilities, options, or freedom of action" or the "handling and administration of the bankrupt estate."* In re Marcus Hook Dev. Park, Inc., 943 F.2d 261, (3d Cir. 1991).

   "Related to" jurisdiction "cannot be limitless," but it is nonetheless "quite broad." In re Boston Reg'l Med. Ctr., Inc., 410 F.3d 100, (1st Cir. 2005) (noting that Congress deliberately allowed the cession of wide-ranging "related to" jurisdiction to the bankruptcy courts "to enable them to deal efficiently and effectively with the entire universe of matters connected with bankruptcy estates")." Quincy Med. Ctr. v. Gupta, 858 F.3d 657, (1st Cir. 2017) 2017 U.S. App. Lexis 9814.

---

[3] Deposition of Mr. José Julián Alvarez at pages 88, 89, 90, 91
[4] Deposition of Mr. Charles Bimbela Quiñones at pages 12, 13, 14, 15, 47

It is an undisputed fact that through this adversary proceeding the Trustee intends to bring defendants Manzano and Silva-Cofresí to a federal forum in order to prosecute claims that are purely state law claims and should be litigated before the Puerto Rico Court of First Instance. In a clear attempt at forum shopping, the Trustee recognizes the "non-core" nature of her claims, by stating that she will not allow this bankruptcy court to enter a final judgment and requesting a "withdrawal of reference", to have the United States District Court for the District of Puerto Rico hear her claims.[5] On this undisputed factual and legal basis, and absent subject matter jurisdiction, this adversary proceeding should be dismissed.

### iv.   In the Alternative, the Honorable Court Should Abstain and Dismiss Upon Abstention

In bankruptcy proceedings, there are two forms of statutory abstention: (1) mandatory abstention under section 1334(c)(2) of title 28; and (2) discretionary abstention under section 1334(c)(l) of title 28. 28 U.S.C. §§ 1334(c)(l) and (2). "A clear congressional policy exists to give state law claimants a right to have claims heard in state court." In re Castlerock Properlies, 781 F.2d 159, (9th Cir. 1986). Accordingly, abstention by bankruptcy courts is designed to further the legislative intent that bankruptcy courts avoid usurping the traditional precincts of the state courts. Cook v. Griffin, 102 B.R. 875, (N.D. Ga. 1989); Williams v. Stefan, 133 B.R. 119 (N.D. Ill. 1991), affd 989 F.2d 929; and In re Republic Reader's Service, Inc., 81 B.R. 422 (Bankr. S.D. Tex. 1987).

Section 1334(c)(2) mandates abstention when certain factors are present. Specifically, Section 1334(c)(2) provides the following:

> " Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section,

---

[5]      The Defendants filed a motion objecting to the jury demand requested by the Trustee and requesting that the stay of the withdrawal of reference until this threshold issue was resolved. (Docket 98).

the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction."

Abstention is ***mandatory*** when the following elements are present: (1) the proceeding is based on a state law claim or cause of action; (2) the claim or cause of action is "related to" a case under title 11, but does not "arise under" title 11 and does not "arise in" a case under title 11; (3) federal courts would not have jurisdiction over the claim but for its relation to a bankruptcy case; (4) an action "is commenced" in a state forum of appropriate jurisdiction[6]; and (5) the action can be "timely adjudicated" in a state forum of appropriate jurisdiction. Stoe v. Flaherty, 436 F.3d at 213. Mandatory abstention applies to Plaintiff's claims for relief against Defendants under Counts II, III, IV, VI, VII, VIII, IX, X, XII and XV.

First; as set forth above, all of Plaintiff's claims for relief in Counts II, III, IV, VI, VII, VIII, IX, X, XII and XV are based on state law claims. Second; to the extent this Honorable Court even has subject matter jurisdiction, Plaintiff's claims for relief are non-core and do not "arise under" Title 11 or "arise in" the bankruptcy case. Third; absent jurisdiction under Section 1334, Plaintiff's claims for relief under Counts II, III, IV, VI, VII, VIII, IX, X, XII and XV could not have been commenced in a federal court, as diversity jurisdiction does not exist. Further, Counts II, III, IV, VI, VII, VIII, IX, X, XII and XV do not involve a federal question. "Only when federal law supplies the rule of decision, or an interpretation of a federal right is an essential ingredient of a claim, does the dispute present a federal question." In re Lemco Gypsum, Inc., 910 F.2d 784 (11th Cir. 1990). Fourth, this action having been just filed before this Court could had been initiated at the Puerto Rico First Instance Court, the forum where it corresponds, but was never commenced because it is entirely meritless and unfounded. Fifth, if filed in the Puerto Rico First

---

[6] In this case no case was began in state court since cause does not exist.

Instance Court, the action can be timely adjudicated in the Puerto Rico courts. Therefore, all the requirements for abstention are met.

Even if this Honorable Court were to determine that certain of the mandatory abstention elements are not present, discretionary abstention under section 1334(c)(l) is appropriate in this case.

The Court may exercise its discretion to abstain pursuant to section 1334(c)(l).

> "Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."

In determining whether to abstain on equitable grounds, courts analyze the following factors: (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable law, (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted "core" proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to bankruptcy court, (9) the burden of [the bankruptcy court's] docket, (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of non-debtor parties. In re Continental Airlines, Inc., 156 B.R. 441 (Bankr. D. Del. 1993).

The factors addressed above with respect to mandatory abstention also support discretionary abstention in this case, mainly the extent to which state law issues predominate over

bankruptcy issues, and the jurisdictional basis, if any, other than Section 1334. Furthermore, resolution of Trustee's claims for relief against Defendants in state court will have no impact on the bankruptcy estates' administration. Finally, the dispute involves non-debtor parties.

As already discussed, Plaintiff's claims for relief under Counts II, III, IV, VI, VII, VIII, IX, X, XII and XV are based solely on state law. "State courts are, by definition, fully competent to resolve disputes governed by state law." In re McCarthy, 230 B.R. 414, (B.A.P. 9th Cir. 1999). Even where the bankruptcy court is familiar with the applicable state law, the state court is considered the better forum to try state law issues. Baxter Healthcare Corp. v. Hemex Liquidation Trust, 132 B.R. 863 (N.D. Ill. 1991).

Given that Trustee's claims for relief against defendants under Counts II, III, IV, VI, VII, VIII, IX, X, XII and XV only involve issues of state law and, as discussed above, are not "related to" the bankruptcy cases, discretionary abstention is appropriate. McCarthy, 230 B.R. at 418. Moreover, litigation of Trustee's non-core claims against defendants promises to be fiercely contested. The litigation would take up an inordinate amount of time and resources that is exponentially greater than the remaining acts to administer the chapter 7 estate and close the bankruptcy case. This disproportionate burden on the Court also favors abstention in this case.

In the case of De Victoria v. 19 Media Publ'ns Corp. (In re 19 Media Publ'ns Corp.), 2014 Bankr. LEXIS 2340, at *7-9 (Bankr. D.P.R. May 29, 2014), this Court, when faced with a situation similar to the case at bar, exercised its discretion to abstain from entertaining the state law claims. In such case, just as in this case, plaintiff made claims against Defendants for breach of fiduciary duties under state law and there were only incidental causes of action under the Bankruptcy Code and which were dependent on the outcome of the non-bankruptcy related causes of action. When

14

abstaining from the case, the Court discussed the prevailing legal standard and concluded the

following:

> Given the aforementioned authority, it is clear that the matter before
> the court is a non-core proceeding. Plaintiffs' complaint is centered
> on the non-bankruptcy causes of action for piercing the corporate
> veil, negligence, civil conspiracy, unjust enrichment, breach
> of fiduciary duties, and fraudulent business practices. The only
> cause of action that is integral to the bankruptcy process is Plaintiffs'
> claim for non-dischargeability of debts. However, in their
> complaint, Plaintiffs' admit that said cause of action is contingent
> upon Defendants being held personally and severally liable. Thus,
> before the court could decide on the non-dischargeability of debts it
> would have to determine "issues that are related to, but not essential
> to resolving the bankruptcy." In re Plaza Resort at Palmas, Inc., 488
> B.R. at 57. As a result, the matter at hand will be treated as a non-
> core proceeding.
>
> Even though mandatory abstention does not apply, Section
> 1334(c)(1) permissive abstention may. "In a case that falls into the
> categories outlined in section 1334(c)(1), bankruptcy courts have
> broad discretion to abstain from hearing state law claims whenever
> appropriate in the interest of justice, or in the interest of comity with
> [s]tate courts or respect for [s]tate law." In re CH Properties, Inc.,
> 381 B.R. 20, 30 (D.P.R. 2007) (citing Gober v. Terra + Corp., 100
> F.3d 1195, 1207 (5th Cir.1996)). The statute delineates three
> "criteria to determine whether abstention is appropriate: the interests
> of justice, comity, and respect for state law." In re Middlesex Power
> Equip. & Marine, Inc., 292 F.3d at 69(citing In re Pan Am. Corp.,
> 950 F.2d 839, 845 (2d Cir. 1991)). Other factors should also be
> considered "in the determination of whether permissive abstention
> is appropriate, including: [1] the extent to which state law issues
> predominate over bankruptcy issues; [2] the presence of a related
> proceeding commenced in state court or other nonbankruptcy court;
> and [3] the likelihood that the commencement of the proceeding in
> bankruptcy court involves forum shopping by one of the parties." Id.
> (citing Christensen v. Tucson Estates, Inc., 912 F.2d 1162, 1166-67
> (9th Cir.1990); In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.,
> 6 F.3d 1184, 1189 (7th Cir.1993)).
>
> Plaintiffs argue that permissive abstention is inappropriate merely
> because the court would potentially adjudicate rights under state
> law. The problem is not the existence of causes of action under state
> law, it is their predominance over bankruptcy matters. The only
> cause of action under the Bankruptcy Code is Plaintiffs' claim for

non-dischargeability of debts. However, Plaintiffs admit that said cause of action is contingent upon the validity of their state law claims. As all the parties are residents of Puerto Rico, there would be no jurisdictional basis for this suit to remain in federal court if not for the bankruptcy. It appears that Plaintiffs' desire to have the case tried in federal court is motivated, at least in part, by forum shopping. Therefore, in respect for state law, the court will exercise its broad discretion and abstain from hearing the matter at hand. (Our Emphasis)

In this case, the Complaint must be dismissed against the Defendants since there is no subject matter jurisdiction under 28 USC 1334. In the alternative, the court should abstain from hearing the state law claims, as all of the requirements for abstention are met.

**C.    THE COMPLAINT SHOULD BE DISMISSED FOR TO FAILURE TO STATE A CLAIM UPON WHICH A REMEDY IN LAW CAN BE PROVIDED.**

Motions to dismiss for failure to state a claim are governed by F.R.C.P. 12(b)(6), which provides that dismissal is proper for "failure to state a claim only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." Gonzalez-Morales v. Hernandez-Arencibia, 221 F.3d 45, 48 (1st Cir. 2000). The Supreme Court of the United States has stated that, to survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, *supra* at 544. "A claim has facial plausibility *when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.*" In re Acosta, 464 B.R. 86, 90 (Bankr. D.P.R. 2011)

This analysis should be made on a case by case basis and a conclusion "whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." "A claim is plausible when the factual allegations permit the Court to draw the reasonable inference that the defendant is liable

16

for the misconduct alleged." "Meeting the plausibility standard requires a complaint to plead **facts that show more than a sheer possibility that a defendant has acted unlawfully.**" 'A complaint that only pleads facts that are merely consistent with a defendant's liability does not meet the plausibility requirement." Ashcroft v. Iqbal, *supra* at 662. Ordinarily, the Court "accepts all well-pleaded factual allegations as true and draws all reasonable inferences in plaintiff's favor." Grillasca-Palou v. U.S. Postal Serv., 573 F. Supp. 2d 493, 495 (D.P.R. 2008) (*citing* Correa—Martinez v. Arrillaga—Belendez, 903 F.2d 49, 51 (1st Cir.1990)).

In an opposition to a Rule 12(b)(6) motion, "a plaintiff cannot expect a trial court to do his homework for him." McCoy v. Massachusetts Institute of Tech., 950 F.2d 13, 22 (1st Cir.1991). The Court will not credit **"bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like" in the plaintiff's favor**." Aulson v. Blanchard, 83 F.3d 1, (1st Cir.1996).

In this case, the Complaint is plagued with these spurious yet completely vague and unfounded allegations against defendants Manzano and Silva Cofresí. From the face of the Complaint it is clear that such allegations fail to comply with the pleading requirements as required by Iqbal and Twombly.

For example, in paragraphs 227 to 230 of the Complaint, Trustee alleged the following:

227. In regard to the facts alleged above involving Fiddler's flagrant business, operational, financial, and regulatory compliance deficiencies, and lacking good faith, the Manzano Group exhibited a knowing, conscious, grossly negligent and reckless disregard for the best interests of Fiddler and, except for their knowing, conscious, grossly negligent and reckless disregard of the facts, they should have known of the risk of damage that ultimately befell Fiddler.

228. Specifically, the Manzano Group engaged in breaches of fiduciary duties, and otherwise abdicated their fiduciary duties of loyalty and good faith owed to Fiddler, with breaches that include, but that may not necessarily be limited to, failing to implement adequate safeguards and controls in regard to financial reporting and other material business, operational, regulatory, and financial functions, including

17

the failure to fully or properly monitor, oversee, and supervise the activities of Manzano and Fiddler in regard to same.

229. Thus, the Manzano Group knowingly breached their oversight duties by utterly failing to implement any reporting or information system or controls or, having implemented such a system or controls, consciously failed to monitor, oversee, or supervise the Debtor' operations and the activities of Manzano, thereby disabling themselves from being informed of risks or problems requiring their attention and, in so doing, they knew that they were not discharging their fiduciary obligations. Moreover, as a result of their inaction (i.e., failing to implement the recommendations of the Cotterman Report), the Manzano Group failed to act in the face of known duties to act, thereby demonstrating a conscious disregard for their responsibilities, and as a result breaching their duty of loyalty by failing to discharge such fiduciary obligations in good faith.

230. Additionally, the Manzano Group either permitted, caused or failed to act when the Debtor, while insolvent, made the (i) Capital Repayment Transfers; (ii) Automobile Transfers; (iii) Preferred Dividend Transfers; (iv) Ultra Vires Transfers; and (v) Expense Account Transfers. (see Docket No. 1, pgs. 55-56).

As can be clearly surmised, the above-stated paragraphs of the Complaint are a textbook example of a "complaint that only pleads facts that are merely consistent with a defendant's liability [that] does not meet the plausibility requirement" that, as the Supreme Court cautioned in Iqbal, would not meet the plausibility and pleading requirements to survive a motion to dismiss. Such paragraphs contain conclusory allegations that merely recite defendants' alleged liability in a vague and nonconcrete manner. Furthermore, it is evident from the lack of specificity and vagueness of the pleadings that the Trustee does not have evidence to support such allegations and that there does not exist even the sheer possibility that defendants could be found liable for the wrongdoings alleged in the Complaint.

Hence, the Complaint fails to state a claim for which a remedy can be provided by the Court and the Complaint shall be dismissed under F.R.C.P. 12(b)(6).

**D.     THE COMPLAINT SHOULD BE DISMISSED DUE TO LACK OF INDISPENSABLE PARTIES.**

In this case, the Trustee has directed this harassing litigation against defendants Manzano and Silva Cofresí, claiming, without admissible evidence, that they are the culprits of the alleged demise of the Debtor.  Nevertheless, in doing so Trustee failed to include as additional defendants several indispensable parties.  Specifically, Trustee failed to include as defendant Mr. Kenneth Bury, Debtor's General Administrator, who was the person in charge of all of the financial affairs and dealings of the Debtor for years, even before Defendants became members of the Executive Committee.  Furthermore, Trustee failed to include the Board of Directors of the Debtor, the entity that, pursuant to the By Laws, was responsible for supervising the Executive Committee and providing final approval of the alleged wrong doings carried out by the defendants.

Federal Rule of Civil Procedure 19 governs whether a party is "indispensable" See Hapag-Lloyd Container Linie, GmBh v. Luis A. Ayala Colón Sucrs., Inc., 209 F.R.D. 285, 286 (D.P.R. 2002).  "A motion to dismiss for failure to join an indispensable party is based on F.R.C.P. 12(b)(7)". OneBeacon Am. Ins. Co. v. Elwell, 2009 U.S. Dist. LEXIS 117402 (D. Maine 2009).

F.R.C.P. 19 is applicable to adversary proceedings through F.R.B.P. 7019. In Jiménez v. Rodríguez-Pagán, 597 F.3d 18, 25 (1st Cir. 2010), the U.S. Court of Appeals for the First Circuit provided the following instruction on how to apply it:

> Rule 19 is designed to protect the interests of parties who are not yet involved in ongoing litigation. To measure how critical those interests are, the rule instructs courts to engage in a two-part analysis. Parties should be joined, when feasible, if they are "necessary" to the action according to the criteria laid out in Rule 19(a). If a necessary party cannot be joined in the action without divesting the court of subject-matter jurisdiction, Rule 19(b) lays out additional criteria for determining whether the party is "indispensable." If the court finds that party is anything less than indispensable, the case proceeds without her. If, on the other hand, the court finds that the litigation cannot proceed in the party's absence, the court must dismiss the case. (Our Emphasis)

The 'critical question' under Rule 19(b) in order to determine whether a party is 'indispensable" is 'whether in equity and good conscience' the action may proceed in the party's absence." <u>Axis Ins. Co. v. Hall</u>, 287 F.R.D. 110, (D. Maine 2012), quoting <u>B. Fernandez & Hnos, Inc. v. Kellogg USA, Inc.</u>, 516 F.3d 18, (1st Cir. 2008) and F.R.C.P. 19(b). Courts must follow a pragmatic analysis of the particular circumstances. This is done on a case by cases basis. Wright & Miller, <u>Federal Practice and Procedure</u> Civil 3d § 1359 (2014 Supplement). "Courts are less concerned with abstract characterizations of the parties and more concerned with <u>whether the rights of the parties can be fairly adjudicated</u>". <u>Minute Man Anchors, Inc. v. Oliver Techs., Inc.</u>, 2005 U.S. Dist. LEXIS 47973 at *35, (W.D.N.C. 2005),

The case of <u>Picciotto</u> v. <u>Cont'l Cas.Co.</u>, 512 F.3d 9, (1st Cir. 2008), quoting <u>Pujol</u> v. <u>Shearson/Am. Express, Inc.</u>, 877 F.2d 132, (1st Cir. 1989) provides that "court[s] should keep in mind the policies that underlie Rule 19, 'including the public interest in preventing multiple and repetitive litigation, the interest of the present parties in obtaining complete and effective relief in a single action, and the interest of absentees in avoiding the possible prejudicial effect of deciding the case without them."

Pursuant to F.R.C.P. 19 (a) a party is "necessary" in order to adjudicate a case if: (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reasons of the claimed interest. The Court must determine whether "considerations of fairness and equity require that the absent party be joined". <u>Rojas</u> v. <u>Loewen Goup International, Inc.</u>, 178 F.D.R. 35 (D.P.R. 1998).

In this case, fairness and equity require that all those parties responsible for the administration and financial affairs of the Debtor be joined as defendants, including the Debtor's General Administrator (Mr. Bury), all other members of the Board of Directors of the Debtor and all the Shareholders of the Debtor and failure to do so should result in dismissal of the Complaint.[7]

Trustee in this case makes claims against defendants Manzano and Silva Cofresí based on breach of fiduciary duties under state law.   Yet, it should be noted that this Debtor, a highly recognized institution composed of the most elite and competent attorneys in Puerto Rico, **did not entrust all its decisions to one or two persons or to a single committee**.   The record demonstrates that all determinative decisions related to the Debtor required the approval of the Board of Directors and in some instances the approval of all the Shareholders.   For example, pursuant to Article II- Management of the Corporation approval by the shareholders was required for the following important actions, among others:[8]

1. Amendments to the Articles of Incorporation and By-Laws of the Corporation;

2. Election of members of the Board of Directors;

3. Ratification of the appointments of the Managing Director of the Corporation and the Division Heads;

4. Approval of the Corporation's annual budget;

5. Incurrence of capital expenditures or expenses in excess of $500,000;

---

[7]   It should be noted that pursuant to Rule 15(c) and the Supreme Court's holding in Krupski v. Costa Crociere S.P.A., 560 U.S. 538 (2010), the Trustee is now impeded from amending the Complaint to join members of the Board of Directors or other shareholder as defendants in this case in order to remedy this omission, inasmuch as the statute of limitations has elapsed for such claims and no "relation back" applies in this case, inasmuch as Trustee made a deliberate and **fully informed decision** not to include the members of Debtor's Board of Directors and/or the Debtor's Shareholders as defendants in this case.   Thus, failure to include such indispensable parties cannot be considered to have been "a mistake concerning the proper party's identity".

[8]   See, the By-Laws of Fiddler González & Rodríguez PSC ("Debtor"), attached as **Exhibit 3.**

21

6.      Approval of the Compensation Policy;

The By-Laws also provide that the following actions required the approval of the Board of

Directors:

1.      Adopt a long-term strategic plan, which plan shall be reviewed
        annually;

2.      Supervise the implementation of the strategic plan; and

3.      Make recommendation to the Shareholders as to the approval of the
        Corporation's budget.

The Complaint alleges in Counts VIII and IX that the economic perils of the Debtor were

caused by defendants Manzano and Silva Cofresí, primarily Mr. Manzano, when, in fact, he had

no authority to make unilateral decisions. Pursuant to Debtor's By-Laws, **all decisions had to be**

**made and approved by the Board of Directors and, in some instances, by all the**

**Shareholders**.

Therefore, if the Plaintiff seeks restitution and/or damages based on such actions, all

responsible parties, not only the defendants Manzano and Silva Cofresí, must be joined.

Specifically, it should be noted that all financial reporting, budgets and payments made as part of

the day to-day administration of the Debtor were the responsibility of Mr. Bury, the General

Administrator designated by the Executive Committee. Furthermore, Mr. Bury also attended those

Board of Directors meetings in which the financial reporting or budgets were discussed. Moreover

the person who had the control over the financial information of the Debtor was Mr. Bury.

Therefore, any and all information presented to the Board of Directors was either prepared by him

or in conjunction with him. Mr. Bury was also responsible of all of the financial reporting of the

Debtor, including but not limited to the budgets and the periodical financial reports prepared for

the consideration of the Board of Directors. Hence, any and all allegations related to financial reporting of lack of financial adequate information are acts and/or omissions for which Mr. Bury is ultimately responsible for and, thus, he was required to be joined as an indispensable party.

### E.   THE COMPLAINT SHOULD BE DISMISSED AS IT FAILS TO STATE A CLAIM AS TO THE BREACH OF FIDUCIARY DUTIES CLAIM.

In Counts VIII and IX the Complaint, Trustee claims that defendants Manzano and Silva Cofresí have breached their fiduciary duties as directors of the Debtor under the doctrine established In re Caremark Int'l Inc. Derivative Litig., *supra*, and, that, accordingly, it has been established that corporate law in Puerto Rico follows corporate law in Delaware (See Docket 1, p. 52). Under these same standards, the Complaint fails to state a claim under Counts VIII and IX.

When considering Delaware corporate law and comparing the high pleading standards required therein, it is evident that the Complaint falls short in Counts VIII and IX, as Trustee has failed to plead facts that show more than a sheer possibility that defendants have acted unlawfully.

In In re BH S&B Holdings LLC, 420 B.R. 112, 146-47 (Bankr. S.D.N.Y. 2009) the Court explained the breach of fiduciary duty standard as follows:

> "The fiduciary duty of due care requires that directors of a Delaware corporation use that amount of care which ordinarily careful and prudent men would use in similar circumstances, and consider all material information reasonably available in making business decisions, and that deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) (internal quotation marks omitted). Under Delaware law, **"[t]o show a breach of the duty of care, plaintiffs must overcome the presumption, known as the business judgment rule, that the defendant directors have acted on an informed basis and in the honest belief they acted in the best interest of the corporation."** *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, 2007 U.S. Dist. LEXIS 74723, 2007 WL 2915181, at *3 (S.D.N.Y. Oct. 4, 2007).

23

"[B]usiness failure is an ever-present risk. The business judgment rule exists precisely to ensure that directors and managers acting in good faith may pursue risky strategies that seem to promise great profit." *Trenwick*, 906 A.2d at 194; *Rabkin v. Philip A. Hunt Chemical Corp.*, 547 A.2d 963, 972 (Del. Ch. 1986) (noting that **without factual allegations that support the allegation that a board's decision was uninformed or grossly negligent, mere dissatisfaction about how directors exercised their business judgment does not state a claim**). "What Delaware law does not do is to impose retroactive fiduciary obligations on directors simply because their chosen business strategy did not pan out." *Trenwick*, 906 A.2d at 173.

"In order for plaintiffs' duty of care claims to survive a motion to dismiss, they must sufficiently plead facts which if true would take defendants' actions outside the protection afforded by the business judgment rule." *Crescent Mach I Partners L.P. v. Turner*, 846 A.2d 963, 984 (Del. Ch. 2000). This has been called "pleading around the business judgment rule." *Stanziale*, 416 F.3d at 238. "To overcome the presumption of the business judgment rule, **plaintiffs bear the burden to show that the defendant directors failed to act (1) in good faith; (2) in the honest belief that the action was in the best interest of the corporation; or (3) on an informed basis.**" *Crescent Mach I Partners L.P.*, 846 A.2d at 984 (citing *Aronson*, 473 A.2d at 812). If a party demonstrates that there was neither a business decision, nor disinterestedness and independence, nor due care, nor good faith was present, the burden of proof shifts to the defendant to show the entire fairness of a transaction. *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). "Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task." *Stanziale*, 416 F.3d at 238. (Our Emphasis).

In this case, the complaint is ***devoid*** of any allegation that demonstrates that the defendants Manzano and Silva Cofresí failed to act in good faith, **in their honest belief that the actions taken were in the best interest of the corporation and on an informed basis**. Moreover, Trustee and her counsel knew prior to the filing of the Complaint that both defendants acted upon such beliefs and that, using their best business judgment, they sought and acted in the best interests of the Debtor based on the information that was provided to them. On the contrary, as the Complaint states, co-defendant Manzano went so far as to seek the counsel of competent external professional

consultants at Altman Weil and implemented as many of the recommended steps and actions as were feasible, considering potential the potential future impact on the Debtor's stability and always acting in the Debtor's best interests (see Docket No. 1, pgs. 26-27).  Both defendants testified as to this in their depositions. **Exhibits 4[9] and 5[10]**

Trustee has failed to rebut the business judgment rule. Counts VIII and XI are merely a recitation of statutory requirements without stating any specific facts that even point to the fact that Defendants did not act according to the business judgment rule. Furthermore, Trustee has failed to plead that the Defendants were grossly negligent with the required specificity under Iqbal and Twombly.

It should be noted that In re BH S&B Holdings LLC also establishes that, aside from the high pleading standard as to the gross negligence and lack of good faith, a plaintiff needs to demonstrate that defendant(s) acted ***in bad faith*** as defined below:

> More specifically, in order for the court to apply an entire fairness standard of review, **the plaintiff must show that a majority of the directors "were either self-interested or dominated by an interested party," or the only explanation for their conduct is bad faith.** *Crescent Mach I Partners L.P.*, 846 A.2d at 981; *see also Stanziale*, 416 F.3d at 238. "Bad faith," which is subsumed in both the fiduciary duty of care, and the fiduciary duty of loyalty discussed *infra*, is "not simply bad judgment or negligence, **but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.**" *Roselink Investors, L.L.C.*, 386 F. Supp. 2d at 221 (citing *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1202, 1208 n.16 (Del.1993)).

---

[9]   Deposition of Mr. José A. Silva Cofresí at pages 34, 68, 86, 87, 88, 95, 96, 97, 99, 100, 102, 116, 126, 127.
[10]   Deposition of Mr. Pedro J. Manzano Yates at pages 11, 14, 31, 32, 37, 38.

Clearly, Trustee In this case has failed to plead with the required specificity in the Counts VIII and XI that defendants Manzano and Silva Cofresí have acted in "bad faith", as required. The Complaint simply fails to state that defendants had a dishonest purpose or moral obliquity.

In In re BH S&B Holdings LLC, 420 B.R. 112, 147 (Bankr. S.D.N.Y. 2009) the Court discussed the standard to rebut a presumption that directors acted on an informed basis:

> A plaintiff may overcome the presumption that directors and officers acted on an *informed basis* by establishing that a decision was the product of an irrational process *or* that directors failed to establish an information and reporting system reasonably designed to provide the senior management and the board with information regarding the corporation's legal compliance and business performance, resulting in liability." *Stanziale*, 416 F.3d at 238 (emphasis in original). (Our Emphasis)

From the letter sent by Attorneys Manzano and Silva Cofresí to the Trustee's attorneys, prior to the depositions, it was evident that the decisions taken, which are now being questioned by the Trustee, were taken after closely analyzing reports provided by competent external professionals (Altman Weil), and by Mr. Bury, the person entrusted as the General Administrator of the Debtor. **See Exhibit 6.** Hence, Trustee has also failed to properly plead in the Complaint a cause of action that overcomes the presumption that Defendants acted on an "informed basis". On the contrary, as previously stated, the Complaint itself describes that Manzano and the so-called "Manzano Group" acted in good faith and made numerous efforts (including seeking the counsel of external consultants who are experts in such matters) in an attempt to salvage the Debtor's financial situation. (Docket No. 1, pgs. 26-27) Once again, Trustee has failed to state a claim as to the alleged breach of fiduciary duties by defendants.

Moreover, it must be underscored that all the allegations contained in the Complaint with respect to this alleged breach of fiduciary duty are the product of hearsay and inadmissible evidence since none of the deponents questioned by the Trustee prior to the filing of the Complaint,

as to the alleged facts,   had personal knowledge of the facts they testified to. **Exhibits 7[11], 8[12] and 9[13].**

### F.     THE COMPLAINT FAILS TO STATE A CLAIM AS TO PREFERENCE CAUSE OF ACTION.

Trustee alleges in Counts XI and XII of the Complaint that under Sections 544, 547, 548 and 550 of the Bankruptcy Code she is entitled to avoid certain transfers made against defendants during the four (4) years prior to the bankruptcy filing.  Trustee also alleges that she is entitled to rescind such transfers because these amounts were alienated without valuable consideration and are presumed to be avoidable transfers.  Trustee intends to "claw back" payments made to Manzano and Silva Cofresí based on their employment contracts and/or as benefits received for their services.  Yet, the record demonstrates that Manzano and Silva Cofresí were entitled to such payments as part of their compensation for services rendered for the benefit of the Debtor during the period in question.  As such, Trustee is not entitled to avoid these transfers as a matter of law.

The Bankruptcy Code provides in Section 547 that a trustee can avoid a transfer of a debtor's interest in property to a creditor **on account of an antecedent debt** if:

> (1) the transfer was made while the debtor was insolvent, and
>
>> (a) within ninety days before the petition date, or
>>
>> (b) in the case of a transfer to an insider, between
>
> ninety days and one year before the petition date; and

---

[11]     Deposition of Mr. José Julián Alvarez at pages 72, 73, 78.
[12]     Deposition of Mr. José A. Sosa Llorens at pages 47, 48.
[13]     Deposition of Mr. Charles Bimbela at pages 33, 35, 58.

(2) the transfer left the creditor better off than the creditor would have been absent the transfer if forced to assert its claim in a chapter 7 bankruptcy. *See* 11 U.S.C. § 547(b).

In this case, the salary and/or compensation payments made to Manzano and Silva Cofresí were not antecedent debts. Furthermore, the compensation payments upon which the Trustee's preference claim is based were "intended by the debtor. . . to be a contemporaneous exchange for new value given to the debtor" and were "in fact, substantially contemporaneous exchanges as defined by 11 U.S.C. §§ 547(c)(1)(A)—(B).) Furthermore, the challenged employment-related payments were "made in the ordinary course of the debtor's and transferee's business or financial affairs;" or "made according to ordinary business terms" as provided by 11 U.S.C. §§ 547(c)(2)(A)—(B).

As to the contemporaneous exchange exception, it has been provided that, in order for it to apply, the exchange must meet three requirements: "(1) the transferee delivered new value, (2) the parties intended the exchange to be contemporaneous, and (3) the exchange was, in fact, substantially contemporaneous." In re Dreier LLP, 453 B.R. 499, (Bankr. S.D.N.Y. 2011). In this case, they payment received by both attorney Manzano and Silva Cofresí, fully comply with the contemporaneous exchange exception, since they were provided in exchange for professional services under the employment agreement of equal or more value.

New value is defined in the Bankruptcy Code as "money or money's worth in goods, services or new credit . . ." 11 U.S.C. § 547(a)(2). Courts have interpreted this term to include the continued services of employees and payments to those employees may be construed as "contemporaneous" so long as the employer-debtor keeps current by paying the employees' salaries and benefits when due. In re 360networks (USA) Inc., 338 B.R. 194, (Bankr. S.D.N.Y.

2005). The compensation payments at issue here were nothing more than salary and benefit payments under the employment terms of defendants which they received in exchange for the "new value" in the form of Defendants' continued services. Defendants Manzano and Silva Cofresí were two (2) of the top billing attorneys and client relationship-producing shareholders for the Debtor. Furthermore, it is an undeniable fact that the Labor and Employment Law Department where both Manzano and Silva Cofresí worked and rendered services to Debtor was the main income producing department of the firm.

Moreover, the Complaint alleges (a fact defendants deny) that their departure from the Debtor produced a deficit of $5 Million. Therefore, it is undisputed that defendants provided the Debtor more than the amounts that the Trustee alleges that were transferred to the defendants. This fact, in and of itself, defeats Trustee's Sections 544 and 548 allegations that the Debtor did not receive consideration or more than a reasonable equivalent value. The question of reasonably equivalent value is based on the "facts and circumstances of each case" and requires the court to "compare what was given with what was received." In re Ruffini, 2014 Bankr. LEXIS 733, (Bankr. E.D.N.Y. Feb. 25, 2014); see In re Jesup & Lamont, Inc., 507 B.R. 452, (Bankr. S.D.N.Y. 2014) ("Whether the debtor received 'reasonably equivalent value' for the alleged fraudulent transfer is ordinarily a question of fact.")

The allegations contained in Counts XI and XII of the Complaint are just a mirror image of the statutory elements. They fail to provide something more than just a recitation of the Code provisions for a preference cause of action. No facts are alleged that can sustain a plausible manner cause of action against defendants.

Furthermore, the Trustee does not have a plausible claim against Manzano and Silva Cofresí as a matter of law, since the payments made were carried out in the ordinary course of business.

The purpose of the ordinary course exception is to "discourage unusual action by either the debtor or his [or her] creditors during the debtor's slide into bankruptcy." In re Carrozzella & Richardson, 247 B.R. 595 (2d Cir. BAP 2000) (quoting H.R. Rep. No. 95-595 at 373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6329) (citations omitted). To qualify as an ordinary course transfer, the transfer must satisfy both a subjective and an objective test. The "subjective element requires an examination of whether the transfer was ordinary between the parties to the transfer." *Pereira*, 508 B.R. at 827(quoting *Daly*, 247 B.R. at 603). This requirement is met as to both Defendants.

Under this test, the court should consider: "(i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment." To support the affirmative defense, the creditor "must establish a 'baseline of dealings'" that will enable the court to evaluate the parties' prior practices and compare that with the transfers in question. Id. at 828. By contrast, the "objective test 'looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on the general practices in the industry, in particular the industry of the creditor.'" In other words, the transfer "must comport with ordinary business terms used by similarly situated debtors and creditors faced with similar circumstances." In re Enron Creditors Recovery Corp., 376 B.R. 442, 459 (Bankr. S.D.N.Y. 2007).

In this case, the industry practice in the legal profession for law firms such as the Debtor support the transfers and the terms carried out between the Debtor and defendants, specifically with respect to car allowance transfers and the expense account transfers. These type of (longstanding benefits) transfers were provided by the Debtor to its Shareholders in the same fashion for several decades. This fact was also known by the Trustee taken prior to the filing of the Complaint since it was testified during the course of the depositions by various deponents. **Exhibits 10[14] and 11[15]**.

Therefore, the Complaint fails to state a claim as to the preference actions claimed by the Plaintiff in Counts XI and XII and such causes of actions must also be dismissed.

## III.   CONCLUSION

Defendants hereby request that this Honorable Court dismiss the Complaint as there is lack of subject matter jurisdiction as to Counts II, III, IV, VI, VII, VIII, IX, X, XII and XV. Furthermore, should the Honorable Court decide that there is subject matter jurisdiction, defendants pray that the Court abstain from considering these non-core causes of action and that the Complaint be dismissed. Furthermore, defendants Manzano and Silva Cofresí allege as additional cause for dismissal that the Trustee, knowingly and with the sole intent to harass defendants and with full knowledge that there is no basis to sustain wrong doing, omitted indispensable parties from the Complaint, including but not limited to Mr. Bury, the General Administrator of the Debtor.

Furthermore, the defendants herein submit that Trustee has failed to state a claim that would allow a remedy in law as to the causes of action for alleged breach of fiduciary duties

---

[14]   Deposition of Mr. José A. Silva Cofresí at pages 40, 51, 56.
[15]   Deposition of Mr. José A. Sosa Llorens at pages 68, 69, 70.

(Causes VIII, IX,X ), for the avoidance of the alleged preferential transfers (Causes XI) and/or for the objection and subordination of claims (Causes XIII and XIV).

This complaint was filed by the Trustee and her counsel in bad faith and with the sole intent of obtaining access to the proceeds from the Executive Advantage Policy, by harassing defendants, damaging their reputation and tarnishing their personal and professional image within the legal community. Prior to the filing of the Complaint the Trustee and her counsel had been provided through written letters and the deposition taken with sufficient evidence that contradicts and disproves the allegations of the Complaint, namely the alleged breach of fiduciary duties of the defendants which is the backbone of this spurious complaint. Yet, in order to be able to establish a claim against co-defendants Liberty Mutual Insurance Company and AON Risk Services for the $7,000,000.00 coverage, they have unnecessarily dragged the defendants through this proceeding. This litigation tactics should not be condoned by this Honorable Court and, therefore, the Complaint should be dismissed as to the herein defendants, attorneys Manzano and Silva Cofresí.

### NOTICE

Within fourteen (14) days after service as evidenced by the certification, and an additional three (3) days pursuant to Fed. R. Bank. P. 9006(f) if you were served by mail, any party against whom this paper has been served, or any other party to the action who objects to the relief sought herein, shall serve and file an objection or other appropriate response to this paper with the clerk's office of the United States Bankruptcy Court for the District of Puerto Rico. If no objection or other response is filed within the time allowed herein, the paper will be deemed unopposed and may be granted unless: (i) the requested relief is forbidden by law; (ii) the requested relief is against public policy; or (iii) in the opinion of the court, the interest of justice requires otherwise.

**WHEREFORE,** for the reasons stated above, defendants Manzano and Silva Cofresí, respectfully request this Honorable Court **to dismiss the Complaint as a whole**, or in the

alternative, abstain from considering such pure state law claims and those core claims directly dependent of the state court claims.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 12th day of July, 2019.

**I HEREBY CERTIFY** that on this date, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel who have filed appearances in this case.

> **C. CONDE & ASSOC.**
> 254 San José Street, 5th Floor
> Old San Juan, Puerto Rico  00901
> Telephone:  787-729-2900
> Facsimile:  787-729-2203
> E-mail:condecarmen@condelaw.com
>
> */s/Carmen D. Conde Torres*
> Carmen D. Conde Torres, Esq.
> USDC 207312
>
> */s/Luisa S. Valle Castro*
> Luisa S. Valle Castro, Esq.
> USDC No. 215611
>
> */s/ William J. Alemañy*
> William J. Alemañy Esq.
> USDC No. 305201

## OFFICIAL TRANSCRIPT OF PROCEEDINGS

### BEFORE THE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

---

RE:

FIDDLER, GONZÁLEZ & RODRÍGUEZ, PSC   *   BANKRUTCY NO.:
                                            *
      Debtor.                        *   17-03403 (MCP)
                                            *

*********************************** CHAPTER 7

DEPOSITION OF MR. JOSÉ JULIÁN ÁLVAREZ MALDONADO

PLACE:    San Juan, Puerto Rico

DATE:     February 28, 2019

## Crespo & Rodríguez, Inc.

Court Reporters
Tel. (787) 706-5930 / 706-8018
Fax (787) 706-8217
PO Box 29002
San Juan, Puerto Rico 00929



88

1      Q      'Vacas gordas'.

2      A      "—vacas gordas," yes.  Now that we have the

3    'vacas gordas', we will have to take steps so that when

4    the 'vacas flacas' period began, we are prepared.  But

5    nothing happened.  Nothing happened.  Are we taking a

6    break at noon or..?

7      Q      We can.

8                        OFF THE RECORD.

9      (Whereupon, the deposition in the above captioned

10   case was recessed for lunch, scheduled to resume at 1:30

11   p.m. of this same day.)

12                                          (1:36 p.m.)

13   BY MR. SUÁREZ:

14     Q      Mr. Álvarez, after the Manzano group left

15   Fiddler, did the board consider enforcing the company's

16   rights, under the non-compete agreement?

17     A      Actually, we considered a lot of the views,

18   but... let me give you some background.

19     Q      Okay.

20     A      I guess that one of the problems is that with

21   our by-laws, we could not sue them in court.  We had to

22   go through arbitration.  And we were going through

23   arbitration at that time with the Pedro Polanco case,

24   which we had to pay half the cost of the arbitrator and

25   our own attorney, and, frankly, we didn't have the money



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

1    to start writing letters, and starting the arbitration

2    proceedings, where we had to do all those payments.

3        So we -- and, also, we had the problem that the

4    Manzano group, they were our witnesses in the Polanco

5    case. And, they didn't, up to that date, they never

6    asked us to return their money. I mean, their capital

7    contributions, so -- and we decided, well, until the

8    Polanco case is over, we should not start, you know,

9    those proceedings. But we were going to start the

10    proceedings.

11        And there were other complications. If you looked

12    at our Certificate of Incorporation, there is a section

13    there which basically -- let me read it to you. It's

14    better if I read it to you.

15        Q    Okay.

16        A    This is 6, Article 6... of 7. Wait a second,

17    no, it's that one 8. Article 8.

18        It says, "Except as provided in Article 102 B 6 of

19    the General Corporation law, a director of the

20    corporation shall not be liable to the corporation, or

21    its stockholders, for monetary damages or breach of

22    fiduciary duty as a director. Any amendment

23    modification or repeal of the foregoing sentence shall

24    not adversely affect any right or protection of the

25    director of the corporation hereunder in respect of any



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*

www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

90

1   act or omission, occurring prior to the time or such

2   amendment modification or repeal."

3        So right there and then we had one strike against

4   these guys, because we could not sue them for monetary

5   damages.  We had to go to arbitration, and it was very

6   limited of what we can claim, which, when you read

7   Article 102 B 6 -- and, I'm sorry; I brought the Spanish

8   version -- it only allows us to "sue them for loyalty,

9   breach of loyalty as a director, acts or omissions which

10  are not in good faith, or are considered improper

11  conduct, or violations of law, with knowledge of it.  Or

12  any other transaction where the director obtains a

13  personal benefit, and -- it says 'indebido', undue

14  personal benefit."

15       So, right there and then, we had one strike.  The

16  other strike that we had, is in Article... Okay, Article

17  10 -- I don't know if you are aware of it -- but Article

18  10 says "To the broadest and maximum event permitted by

19  the General Corporation Law, the corporation shall

20  indemnify each person who was, or is, a party, or is

21  threatened to be made a party, or threatened pending or

22  completed action, suit, or proceeding whether civil,

23  criminal, administrative, or investigative by reason of

24  the fact that he or she is or was a director or an

25  officer."



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

91

1    So, right there, we had to indemnify them, if they

2    were found, you know,  liable.  And, two says, that we

3    had, not only we had to do that, but we have to pay for

4    the, for the attorney's fees.

5    And you can understand that, in our situation, we

6    could not pay them for their defense, as our Articles of

7    Incorporation stated.

8    So we had the arbitration problem, we had this

9    problem, the Articles of Incorporation.  We had the

10   problem with the Polanco case.  And, I don't have

11   personal knowledge of this, but I was told, after they

12   left, that, that most of them, or all of them, had

13   established trusts to protect their assets, in case of a

14   claim.

15   Maybe Mr. Sosa can talk about that, because I, I

16   don't know if he was involved in that, or knew about it,

17   or whatever.  So--

18   Q    Sosa Lloréns.

19   A    Yes.  It was an uphill battle.  I mean -- and

20   also, we had... we had the problem -- you don't have

21   this problem, but we did have it --- and it's that it,

22   that it was insured versus insured problem.  I mean, if

23   we did a claim against them, the insurance policy would

24   say, "Okay, that's your problem.  We're not covering,

25   because you are suing an insured party, and your insured



## OFFICIAL TRANSCRIPT OF PROCEEDINGS

### BEFORE THE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

EXHIBIT

2

RE:

FIDDLER, GONZÁLEZ & RODRÍGUEZ, PSC   *   BANKRUTCY NO.:
                                     *
        Debtor.                      *   17-03403 (MCP)
                                     *
*********************************   CHAPTER 7


DEPOSITION OF MR. CHARLES BIMBELA-QUIÑONES


**PLACE:**    San Juan, Puerto Rico

**DATE:**    February 27, 2019


## Crespo & Rodríguez, Inc.

Court Reporters
Tel. (787) 706-5930 / 706-8018
Fax (787) 706-8217
PO Box 29002
San Juan, Puerto Rico 00929



12

1    it.

2         A     Some of them expressly told some people about

3    that.

4         Q    During this period of time, that you served on

5    the Executive Committee, were there any negotiations

6    with Oriental Bank to give back a lease of the premises?

7         A     Yes.  I was not, I was not directly involved

8    in that, but I... I... we discussed it.

9         Q    Who conducted the negotiations with Oriental

10   Bank?

11        A     Hhhh, Ricardo Ortiz; José Julián Álvarez, I

12   think; and at some point Luis Oliver, but he left the

13   firm some time before.  Mostly I think it was them.

14        Q    The shareholders of the firm were bound by a

15   non-compete agreement.  Are you familiar with the non-

16   compete agreement?

17        A     Yes, I am.

18        Q    The Debtor scheduled claims against the

19   departing shareholders for violations of the non-compete

20   agreement.

21        A     Mmhm.

22        Q    Did the firm ever make any effort to enforce

23   the non-compete agreement against the departing

24   shareholders?

25        A     Mmmm, no, I know, or I recall that we



Crespo Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

13

1    discussed that, that issue.

2        Q    Who was involved in those discussions?

3        A    I think the Board of Directors.

4        Q    Was there any discussions as to whether the

5    non-compete agreements were enforceable under Puerto

6    Rican law?

7        A    Hhhh, yes.  Yes, the... I think the general

8    conclusion was that it was.

9        Q    Why was the decision made not to pursue the

10   departing shareholders for violating the non-compete

11   agreements?

12       A    I don't think there was a specific and final

13   decision not to do it, but we considered it.  And,

14   basically, there were some issues.  First, as I may

15   recall it, there was an issue that, under the bylaws, we

16   had no claims between the firm or the stockholders.  We

17   had to go through arbitration.

18       And... that would have a great -- we would have to

19   hire lawyers, and go through the process of the expense

20   of having arbitration.

21       And then, at that point, we were focused on trying

22   to make the firm go through, and try to save it.

23       Q    Was there any effort made to stop the

24   departing shareholders from leaving with clients of the

25   firm?



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

14

1    A    And something else, I understand that somebody

2    -- I don't recall who -- raised the issue whether that

3    some of the clients that went with those attorneys, were

4    still giving us some work, and they would be affected by

5    us making the position that the lawyers that they

6    elected to go and follow with them, were not able to do

7    so.

8    So we thought it would have an adverse effect on

9    the firm continuing doing business.  So we left it like

10   that, on hold, to see if we could go ahead and make the

11   firm keep on business, and maybe then make the decision

12   if we should go ahead and...

13   Q    Was a demand ever made of a departing

14   shareholder under the non-compete agreement?

15   A    Was there what?

16   Q    Was a demand ever made?

17   A    I don't think so.  At one point in time, I

18   think it was Carlos Padilla who raised the issue when

19   Juan Carlos Pérez Otero, Alicia Figueroa, and another

20   attorney left the firm to go to the Pietrantoni Méndez &

21   Álvarez firm, and he asked us to consider whether we

22   should send Pietrantoni a letter advising them of the

23   non-compete agreement, but at that time, one of the

24   issues was with Puerto Rico Telephone Company who was

25   still giving us work.



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

15

1     And at that point, they raised to -- they decided

2  to leave that until further discussion.  But I don't

3  think there was a letter sent directly to any

4  stockholder, for the reasons... I know that, or I can

5  recall that sometime before that, when the first, some

6  people went from the firm, I think a subpoena, when

7  Manzano was the president, he affirmed or said that

8  maybe we should go ahead, and to make some claims to

9  those people.

10     But I don't recall the date, and which stockholders

11  they were, at that time.

12  MR. VILARIÑO:

13     Jesús, before -- when you're done with the Trust

14  process in this line of questioning, we might go off the

15  record a little bit, so we can have the discussion with

16  the parties that want to come in.

17  MR. SUÁREZ:

18     Let's do that now.

19  MR. VILARIÑO:

20     Okay.

21                    OFF THE RECORD.

22  MR. SUÁREZ:

23     Okay.

24  THE DEPONENT:

25     I have something else--



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

47

MR. VILARIÑO:

    Yes.

BY MR. SUÁREZ:

    Q   Mr. Bimbela, you mentioned when considering they were filed, or made demands against the former shareholders that you had considered that the claims may have been subject to arbitration.

    A   Yes.

    Q   Why was that?

    A   Because of the by-laws that stated that every claim of any stockholders with the firm, or a firm with stockholders, had mandatory arbitration.  That was at least what was discussed in those meetings.

    I didn't make any research or evaluation as to if that applied, but it was discussed.

    Q   You also suggested that the firm would have to hire lawyers.  Is that correct?

    A   Yes.

    Q   Is there any reason that the firm couldn't have done it in-house?

    A   Uhhh... no, but not a particular reason, it's not advisable to defend yourself in a case.

    Q   I want to, I want to go back to the transfer of the line of credit from Banco Popular to Oriental Bank.



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

EXHIBIT

3

# BY-LAWS

## OF

## FIDDLER GONZALEZ & RODRIGUEZ, PSC

### ARTICLE I – Preamble and Definitions

A. **FIDDLER GONZALEZ & RODRIGUEZ, PSC** is a for-profit professional services corporation governed by the provisions of the Puerto Rico General Corporations Act of 2009, as amended, and any successor act adopted thereafter. The Corporation shall engage in the practice of law under the name "Fiddler González & Rodríguez, PSC".

B. The Corporation as a professional services corporation shall adhere to the applicable regulation of the practice of law of the jurisdictions where its shareholders, legal staff and employees are authorized to practice law and actively practice law.

C. The following meanings are to be given to the following terms used in these By-Laws:

"Assistant Secretary" means the assistant secretary of the Corporation described in Article VII, Section C of these By-Laws.

"Assistant Treasurer" means the assistant treasurer of the Corporation described in Article VII, Section D of these By-Laws.

– 2 –

"Basic Benefits Package" means the basic benefits package as described in Article III (D)(2) of these By-Laws.

"Basic Compensation" means the basic compensation package as described in Article III (D)(3) of these By-Laws.

"Board of Directors" means the board of directors of the Corporation.

"Compensation Policy" means the compensation policy applicable to the Shareholders to be adopted by the Board of Directors with the advice and recommendations of the Executive Committee and approved by the Shareholders.

"Corporation" means Fiddler González & Rodríguez, PSC.

"Corporate Documents" means the Certificate of Incorporation, By-Laws and any other corporate governance document of the Corporation.

"Corporations Act" means the Puerto Rico General Corporations Act of 2009, as amended, and any successor act adopted thereafter.

"Director" means a director of the Board of Directors.

"Division" means the litigation practice division, the employment and labor law practice division, the corporate practice division and any other practice division created and authorized by the Shareholders.

"Division Head" means the head of a Division of the Corporation.

"Executive Committee" means the executive committee of the Board of Directors described in Article II (C).

- 3 -

"General Administrator" means the general administrator of the Corporation appointed by the Executive Committee.

"Legal Staff" means collectively the associates, senior associates, junior members, members, of counsels and special counsels.

"Managing Director" means the managing director of the Corporation described in Article VII, Section B of these By-Laws.

"Net Profits" means the net profits of the Corporation remaining each fiscal year after paying (or setting aside funds for paying) all expenses of the fiscal year (including the bonuses of employees and Legal Staff (excluding members)) and after making annual allocations to the retained earnings account of the Corporation.

"Performance Compensation" means the performance compensation as described in Article III(D)(4) of these By-Laws.

"Secretary" means the secretary of the Corporation described in Article VII, Section C of these By-Laws.

"Shareholder" means a shareholder of the Corporation.

"Termination of a Shareholder" means the termination of a Shareholder whereby the Shareholder ceases to be a shareholder of the Corporation.

"Treasurer" means the treasurer of the Corporation described in Article VII, Section D of these By-Laws.

– 4 –

## Article II – Management of the Corporation

A.    Shareholders:

(1)    The ultimate power and authority on all corporate matters shall reside in the Shareholders. The general management of the Corporation is hereby delegated by the Shareholders to the Board of Directors, the Executive Committee, and the Managing Director in their respective areas as set forth in these By-Laws.

(2) The Shareholders shall meet at least once every three months. Special meetings may be called by the Managing Director or at the request of three or more Shareholders. Unless otherwise provided, all decisions shall be approved by a majority of issued and outstanding shares of common stock of the Corporation present, in person or by proxy, at the meeting where quorum has been certified by the secretary of the meeting.

(3) The Shareholders' approval (either by vote or consent) shall be required for action of the following matters as provided in these By-Laws:

   (a)    Admission of new Shareholders;

   (b)    Termination of a Shareholder;

   (c)    Amendments to the Articles of Incorporation and By-Laws of the Corporation;

   (d)    Opening or closing of an office;

   (e)    Election of the members of the Board of Directors;

– 5 –

(f)      Ratification of the appointments of the Managing Director of the Corporation and the Division Heads;

(g)      Approval of the Corporation's annual budget;

(h)      Incurrence of capital expenditures or expenses in excess of $500,000, not in the ordinary course of business and which are not contemplated in the Corporation's annual budget approved by the Shareholders;

(i)      Merger with or acquisition of other practices or a corporate reorganization of the Corporation, including but not limited to the conversion to a limited liability company or a limited liability partnership;

(j)      Dissolution, liquidation or sale of all or substantially all the assets of the Corporation;

(k)      Changes in name of the Corporation;

(l)      Admission and promotion of Legal Staff;

(m)      Bonuses for the Legal Staff (excluding Members);

(n)      The creation, elimination or consolidation of a Division, with the vote of 75% of the number of Shareholders (rounded upward); and

(o)      Approval of the Compensation Policy.

– 6 –

(4) No person shall be hired if such person meets with the express disapproval of three (3) or more Shareholders.

(5) At each meeting of Shareholders, the presence in person or by proxy of the holders of shares of stock having a majority of votes which could be cast by the holders of all outstanding shares of stock entitled to vote at the meeting shall be necessary and sufficient to constitute quorum. If quorum is not reached, a new meeting of Shareholders shall be set the next business day where the holders of shares of stock having a thirty three percent (33%) of votes which could be cast by the holders of all outstanding shares of stock entitled to vote at the meeting will constitute quorum in that meeting. A Shareholder can only give a proxy to another Shareholder.

(6)    The Secretary or the Assistant Secretary shall be designated as secretary at each Shareholders meeting and shall keep minutes of the meeting. Said minutes shall be a permanent part of the Corporation's records. If the Secretary or the Assistant Secretary are not present during the meeting, the Shareholders present at the meeting will elect an *ad hoc* Secretary who shall keep minutes of the meeting.

B.    Board of Directors:

(1) Directors – The Board of Directors shall consist of not less than 11 members, as determined from time-to-time by the Shareholders. The Directors shall be elected by the Shareholders. The Board of Directors shall meet monthly. The agendas for meetings of the Board of Directors shall be distributed by the Managing Director or the Secretary at least twenty-four (24) hours prior to the meeting. A special meeting

may be called at any time by two Directors upon reasonable notice of time and place to the other Directors.  The Directors shall be elected for a term of 2 years.  All members of the Board of Directors shall be Shareholders.  Each member of the Board of Directors shall have one vote.

(2)    Duties – To the extent permitted by law and subject to the duties and powers delegated to the Executive Committee in these By-laws, the Board of Directors shall have the duties assigned by such body by the Corporations Act.  The above sentence shall not be construed as a limitation to the powers and duties of the Executive Committee established in these By-Laws.  The following actions require the approval by the Board of Directors:

(a)    Ensure enforcement of the policies established by the Corporation;

(b)    Adopt a long-term strategic plan, which plan shall be reviewed annually;

(c)    Supervise the implementation of the strategic plan;

(d)    Make recommendations to the Shareholders as to the admissions of new Shareholders;

(e)    Make recommendations to the Shareholders as to the termination of Shareholders;

(f)    Approve promotions (or demotions) and salary increases (or decreases) of the members of the Legal Staff;

- 8 -

(g)     Appoint the Managing Director of the Corporation and the Division Heads, subject to the ratification of the Shareholders;

(i)     Appoint the Secretary (and Assistant Secretary) and Treasurer (and Assistant Treasurer) of the Corporation and any other officer of the Corporation;

(h)     Make recommendations to the Shareholders as to the approval of the Corporation's annual budget.

The management time of the Directors shall be treated as billable time.

(3)     Quorum – At all meetings of the Board of Directors, a majority of the members of the Board of Directors shall constitute quorum.  A vote of a majority of the Directors present at a meeting at which quorum is present shall be the act of the Board of Directors.

(4)     Minutes - Minutes of Meetings.  The Secretary or the Assistant Secretary shall be designated as secretary at each meeting of the Board of Directors and shall keep minutes of the meeting.   Said minutes shall be a permanent part of the Corporation's records.  If the Secretary or the Assistant Secretary are not present during the meeting, the Directors present at the meeting will elect an *ad hoc* Secretary who shall keep minutes of the meeting.

C.     Executive Committee:

(1)     Organization – The Executive Committee is organized pursuant to the provisions of Article 4.01 of the Corporations Act.   The main function of the Executive Committee is to provide general direction, establish policy, and determine

- 9 -

strategies to be followed by the Corporation, and to provide advice and recommendations to the Board of Directors. The Executive Committee is to insure that the Corporation provides legal services of the highest professional standards and at a reasonable cost to the client.

(2)    Appointment – The members of the Executive Committee shall consist of the Shareholders appointed by the Board of Directors as Division Heads and the Managing Director of the Corporation. Such appointment shall be made by the majority of the members of the Board of Directors without taking into consideration the vote of any member of the Board of Directors who is being nominated as a Division Head or as Managing Director of the Corporation. The appointment of the Division Heads and Managing Director of the Corporation shall become effective after being ratified by more than fifty (50%) percent of the Shareholders (rounded upward).

(3)    Duties – To the extent permitted by law and subject to the authority of the Board of Directors recognized by subsections (a) and (c) of Article 4.01 of the Corporations Act, it is intended that the Executive Committee shall be vested with the authority of the Board of Directors necessary to take any and all actions which are usual and customary in connection with the management of the Corporation. The duties and authority of the Executive Committee shall include the following:

(a)    Coordinate the professional services rendered by the Divisions with the objective of providing the Corporation's clients with complete legal services of excellent quality;

- 10 -

(b)      Recommend to the Board of Directors (for further recommendation by the Board of Directors to the Shareholders) the candidates for election as members of the Board of Directors;

(c)      Recommend to the Board of Directors the candidates for appointment of the Division Heads and the Managing Director of the Corporation, provided that in recommending candidates for Division Heads, the Executive Committee shall consider the opinion of the Shareholders of the particular division;

(d)      Recommend to the Board of Directors (for further recommendation by the Board of Directors to the Shareholders) admissions of new Shareholders;

(e)      Recommend to the Board of Directors (for further recommendation by the Board of Directors to the Shareholders) the termination of Shareholders;

(f)      Recommend to the Board of Directors the components and the amount of compensation for each Shareholder;

(g)      Recommend to the Board of Directors the compensation of the Corporation's Legal Staff, for its approval.

(h)      Recommend to the Board of Directors salaries and bonuses for all non-legal personnel and the discretionary contributions to the applicable pension plan.

(i)      Provide for and supervise the general administration of the Corporation, including financial, personnel, electronic data processing, collections, etc.

(j)      Appoint a General Administrator, who shall report to the Executive Committee, the Board of Directors and to the Managing Director on a regular basis.

-- 11 --

(k)   Purchase, acquire, sell, dispose of and otherwise deal with such property as the Executive Committee may deem necessary or appropriate in the furtherance of the purposes of the Corporation and in the usual and ordinary course of business; provided, however, that any capital expenditure in excess of $500,000 which was not previously approved by the Shareholders, either through the approval of the Corporation's annual budget or otherwise, shall require the prior approval of the Shareholders.

(l)   Establish and supervise a program for recruitment of lawyers, law clerks and paralegals.

(m)   Establish training and educational programs for lawyers, law clerks and paralegals.

(n)   Determine the staffing requirements and salaries.

(o)   Coordinate the maximum utilization of the Corporation's services by the clients.

(p)   Plan and coordinate activities that enhance the professional image of the Corporation such as seminars to clients, publication of articles, books, etc.

(q)   Establish and supervise a program for the evaluation of lawyers, law clerks and paralegals.

(r)   Resolve conflict of interests.

(s)   Develop criteria as to accepting new cases and clients.

(t)   Provide for adequate physical facilities for the Corporation.

- 12 -

(u)    It may, from time to time, cause a uniform set of rules and policies of the Corporation to be prepared and distributed in an office manual to all Shareholders, Legal Staff and employees of the Corporation.

The Committee shall refer any matter upon which the majority of the Executive Committee is not in agreement to a meeting of the Board of Directors for a decision or final adjudication.

(4)    Delegation of Authority – (a) Any part of the authority vested in the Executive Committee may, at any time and from time to time, be delegated by it to the Managing Director or to an *ad hoc* committee. Such authority may be delegated to the Managing Director with power only to recommend to the Executive Committee, or with power to act. In the latter event, the action of the Managing Director shall be the action of the Executive Committee. Authority may also be delegated to an *ad hoc* committee with power only to recommend to the Executive Committee. Any delegation may be terminated by the Executive Committee or the Board of Directors at any time.

(b) The Executive Committee shall decide, from time to time, the number and purpose of any *ad hoc* committees, the members (one or more) composing each *ad hoc* committee, the names of the members of each *ad hoc* committee and their functions, powers and authority. The Executive Committee may at any time modify or revise prospectively any authorized decision of any *ad hoc* committee. Shareholders and

– 13 –

members of the Legal Staff may be designated to be members of any *ad hoc* committee.

(5)     Meetings – The Executive Committee shall meet in person or through electronic means at such times as the Executive Committee shall determine, upon reasonable notice to all members by the Managing Director.  A special meeting may be called at any time by any two members of the Executive Committee upon reasonable notice of the time and place to other members.   Each member of the Executive Committee shall have one vote.   The management time of the members of the Executive Committee shall be treated as if it was billable time.

(6)     Quorum -- At all meetings of the Executive Committee, a majority of the members of the Executive Committee shall constitute quorum.  A vote of a majority of the members of the Executive Committee present at a meeting at which quorum is present shall be the act of the Executive Committee.

D.     Managing Director:

(1)     Appointment – Every two years the Shareholders shall ratify the appointment of the Managing Director of the Corporation by the Board of Directors. The Managing Director of the Corporation shall be appointed by the Board of Directors pursuant to a recommendation of the Executive Committee from among the Shareholders of the Corporation that is not a Division Head, unless the vote of 75% of the number of Shareholders (rounded upwards) approves the appointment of a Division head as the Managing Director.  The Managing Director of the Corporation

- 14 -

shall also be the Chairman of the Board of Directors and the Chairman of the Executive Committee.  The Managing Director shall be  a member of the Board of Directors and the Executive Committee.  No person may serve as Managing Director for more than two full consecutive terms, unless approved by the vote of 75% of the number of Shareholders (rounded upwards).  The Managing Director shall serve his or her term until his or her successor is duly elected and qualified or until his or her earlier resignation or removal by the Board of Directors.  In the event of a vacancy in the office of the Managing Director during his or her term, the Board of Directors shall fill said vacancy by appointing thereto another Shareholder to serve for the remainder of the term.

(2)   Duties – The Managing Director shall act as chairman of all of the Shareholders' meetings, meetings of the Board of Directors, and of the Executive Committee.  He or she shall present a report to the Shareholders and to the Board of Directors at each meeting regarding the operations and condition of the Corporation. In addition, he or she shall supervise and be in charge of the day-to-day administration of the Corporation, develop policy recommendations and meeting agendas and ensure implementation of both a short-term and long-term strategic business plan.   The Corporation shall treat the Managing Director's administrative time as if it were billable time.

### ARTICLE III -  Shareholders

A.   Shareholders Duties

– 15 –

(1)    Each Shareholder has the duty to fulfill with dedication and competence his or her commitments towards the Corporation. It is expected that every Shareholder dedicate all his or her working hours to activities directed to increasing the economic welfare of the Corporation, achieving the Corporation's strategic objectives, the administration of the law firm, maintaining an excellent professional relationship with the clients of the Corporation and to effectively participate in promotional, professional and civic activities which result to the benefit of the Corporation.

(2)    Each Shareholder shall give, whenever required, true account of all business transactions arising out of the conduct of the Corporation. Without the written consent of the Board of Directors, no Shareholder shall engage in any practice of law or receive any compensation or benefit related to the practice of law except for the benefit of the Corporation.

(3)    The Shareholders agree that, in all matters affecting the Corporation's practice and their particular practice of law within the Corporation, they will maintain a standard of professional conduct which, at all times, complies with the provisions of the canons of professional ethics, as adopted by the Supreme Court of Puerto Rico, and all applicable statutes, rules and regulations relating to the rendering of professional services to clients of the Corporation.

B.    Termination.

Any Shareholder may be expelled from the Corporation, with or without cause, upon the vote of 75% of the number of Shareholders (rounded upwards and excluding

- 16 -

the Shareholder to be expelled) effective immediately upon delivery to such expelled Shareholder of a written notice signed by the Managing Director. In such case, the former Shareholder's shares of common stock in the Corporation shall be redeemed in accordance with ARTICLE III, Section E(2)( b).

C.   Admission of New Shareholder:

Unanimity of the Shareholders shall be required for the admission of a Shareholder who is not part of the Legal Staff. If the prospective Shareholder already works for the Corporation, he or she may be admitted as a Shareholder with up to two opposing Shareholders.

D.   Compensation:

(1)   Each Shareholder shall receive a compensation package that includes a Basic Benefits Package, Basic Compensation and, if applicable, Performance Compensation.

(2)   The Executive Committee will recommend for the approval of the Board of Directors, subject to the modifications and amendments approved by the Board of Directors, the amount and the components of the Basic Benefits Package. The Basic Benefits Package shall be the same to all Shareholders.

(3)   The Executive Committee will recommend for the approval of the Board of Directors, subject to the modifications and amendments approved by the Board of Directors, the components of Basic Compensation and the amount of Basic Compensation for each Shareholder. In such evaluation, the Executive Committee and

- 17 -

the Board of Directors shall take into consideration each Shareholder's past and expected future contributions to the Corporation and other factors included in the Compensation Policy.

(4)     At the end of each fiscal year of the Corporation, and after payment of Basic Benefits Package and Basic Compensation to each Shareholder and payment of all other expenses pertaining to the Corporation (including salaries and other compensation paid to the Legal Staff and other employees) the Board of Directors shall approve an allocation of a reasonable amount of the Net Profits before taxes, if any, for payment of Performance Compensation to Shareholders, the amount being based on criteria to be set forth in the Compensation Policy.

E.     <u>Withdrawal as Shareholder of the Corporation</u>:

(1)     Disability – (a) Six (6) months after a Shareholder becomes temporarily disabled, physically or mentally, and if such disability continues, his or her total compensation from the Corporation from then on shall be modified as follows:

— 75% for the next six (6) months of disability;

— 50% for the next six (6) months following; and

— 25% for a final twelve (12) month period.

(b)     On returning to practice in the Corporation at any time within a thirty (30) month period after disability occurs will restore the disabled Shareholder to his or her full compensation, commencing with the first month following the resumption of active corporate responsibilities.

– 18 –

(c) If, in the opinion of a qualified physician, a temporarily disabled Shareholder is considered to have become permanently disabled, the Board of Directors may terminate his or her relationship as a Shareholder of the Corporation by a written notice to the disabled Shareholder or his or her representative.

(d) In such a case, in exchange for the Shareholder's shares of common stock of the Corporation, the disabled Shareholder shall receive, in lieu of the percentage payments set forth above, all payments provided for in cases of retirement (as set forth in Section G of this ARTICLE III), as though the Shareholder's retirement had taken place on the date of disability, with payment being deferred to commence as of the date of notice of termination.

(2) Voluntary Withdrawal; Termination

(a) After adequate written notice, a Shareholder is free to withdraw from the Corporation. The withdrawing Shareholder shall remove his or her personal effects from the offices of the Corporation prior to the expiration of such notice. A proper accounting shall be made of the accounts of the withdrawing Shareholder.

(b) The value of the shares of common stock of the withdrawing or expelled Shareholder shall be such just and reasonable compensation as may be agreed upon by the Shareholders. Such shares of common stock of the withdrawing or expelled Shareholder shall be paid by the Corporation in no more than sixty (60) monthly installments of not less than One Thousand Dollars ($1,000.00) each. Except for the amount of the initial capital contribution, all Shareholders must work for the

– 19 –

Corporation as Shareholders during a period of not less than five (5) years, before they are entitled to receive their corresponding compensation for their proprietary interest.

F.    <u>Maximum ownership allowed per Shareholder</u>.   At no time may a Shareholder own more than fifteen percent (15%) of the shares of common stock outstanding.  Upon withdrawal of a Shareholder, his or her shares may be distributed among the remaining Shareholders in the same proportion of ownership immediately preceding the withdrawal.  For purposes of this section only, the term "withdrawal" shall include voluntary withdrawal or resignation, retirement, involuntary dismissal due to disability, expulsion or termination, and death.

G.    <u>Redemption of Shareholders' common stock upon Death, Permanent Disability or Permanent Retirement:</u> In exchange for his or her shares of common stock in the Corporation, upon the death, permanent disability, or permanent retirement of a Shareholder, the Corporation shall pay in cash to his or her estate or to him or her, or to his or her nominee or nominees, in accordance with the provisions of any valid written instruments which he or she may have left such just and reasonable compensation as may be agreed upon by the Shareholders.  Said amount shall be paid in full in no more than sixty (60) monthly installments of not less than one thousand dollars ($1,000) after the Shareholder's death or permanent disability.

H.    <u>Retirement:</u>

The Shareholders will retire upon reaching the age of sixty-eight (68).

I.    <u>Limitations of Former Shareholders:</u>

- 20 -

(1)      Limitations Imposed on Former Shareholders.

To the extent permitted by law, when a Shareholder separates from the Corporation and decides to practice his or her profession within the Commonwealth of Puerto Rico in such a manner as to compete with or adversely affect the practice of the Corporation, such Shareholder forfeits any and all income payments from the Corporation due to such Shareholder.

A former Shareholder shall be considered to be in competition with the Corporation if the services to be rendered by him or her while the former Shareholder is not associated with the Corporation are rendered to a person that is a client of the Corporation that the former Shareholder served in the last twelve (12) months prior to ceasing being associated to the Corporation as a Shareholder or otherwise.

(2)      To the extent permitted by law, the Corporation shall have the right to terminate the right of a former Shareholder that breaches subsection I(1) of this Article III to receive continuing income payments, and to make no further income payments, if after notice to the former Shareholder to cease and desist he or she continues in violation for more than 30 days.

## ARTICLE IV - Termination

The Corporation's existence may be terminated at any time by an affirmative vote of the Shareholders representing eighty percent (80%) of the issued and outstanding shares of common stock of the Corporation, at a Shareholders meeting

- 21 -

called expressly to consider termination. Upon termination, no further professional services shall be rendered in the Corporation's name, and no further business shall be transacted except to the extent necessary to wind up the affairs of the Corporation.

In advance of the effective date of termination, every incomplete professional service shall be assigned to one or another of the Shareholders on terms agreeable to them.

The members of the Board of Directors shall be trustees in liquidation of the Corporation.

The assets of the Corporation shall be used to pay, or provide for, all debts of the Corporation as well as all costs of liquidation. Costs of liquidation shall include reasonable compensation for the trustee or trustees in liquidation.

All assets remaining shall be divided according to the shares of common stock held by each Shareholder in the Corporation.

A corporate reorganization of the Corporation, including but not limited to a conversion to a different type of entity such as a limited liability company or a limited liability partnership, whereby the Corporation will continue its business through a successor entity or otherwise shall not be deemed a termination for purposes of this Article IV.

- 22 -

## ARTICLE V -- Finances; Files and Records

A.    The Corporation shall maintain proper and complete books of account on an accrual basis, subject to inspection at any time by any of the Shareholders, or by the legal representative of any of the Shareholders.

B.    The Corporation books shall be balanced annually at the close of the fiscal year, for which an independent certified public accountant shall be employed to prepare annual statements, Corporation's tax returns, balance the books, and make determinations required by the provisions of these By-Laws and the laws of the Commonwealth of Puerto Rico.

C.    As soon as possible after the close of the fiscal year, audited consolidated financial statements shall be prepared.

D.    All Shareholders expressly recognize and agree that all files, papers, records, documents and legal matters are the sole property of the Corporation or the clients as the case may be, and no Shareholder has any separate property interest therein.  Whenever any Shareholder shall become disassociated from the Corporation for any reason, he or she shall leave with the Corporation all files, papers, records, documents or legal matters in any way related to law business or the practice of law. Under no circumstances shall any Shareholder take with him or her, except with the express written permission of the Executive Committee, any files, papers, records, documents or legal matters in any way related to law business or the practice of law. The sole exception to this rule is the notarial protocols maintained by the Shareholders.

- 23 -

E.     Any violation of any provision of subsection D. of this Article VI shall bar the violating Shareholder from receiving and being paid any amounts or benefits to which he or she might otherwise be entitled from the Corporation or its Shareholders under these By-Laws or under any agreement with the Corporation and/or the Shareholders.  The Board of Directors shall make the determination of whether a violation of subsection D. of this Article VI has occurred.  The Corporation shall not be restricted by the provisions hereof from pursuing any and all other additional remedies or claims for damages or other relief that may arise or to which the Corporation may be entitled by reason of any violation of subsection D. of this Article VI.

## ARTICLE VI - Arbitration: Miscellaneous

A.     In the event of a controversy or claim arising out of the Corporate Documents which cannot be settled by the Shareholders or their legal representatives, it shall be settled through binding arbitration before a single arbitrator who shall be a resident of Puerto Rico.  The arbitration shall take place in San Juan, Puerto Rico in accordance with the Commercial Arbitration Rules of the American Arbitration Association and judgment upon the award may be entered in any court having jurisdiction. The arbitration shall be conducted in the Spanish language and the arbitrator shall apply the substantive law of Puerto Rico.  Each party shall bear its own costs and both parties will share equally in the administrative costs of the arbitration, including the fees and expenses of the arbitrator.

- 24 -

B.     All provisions of the Corporate Documents shall be binding upon, and be of benefit to, each Shareholder as well as any future Shareholder admitted to Corporation in accordance with its terms and provisions of the By-Laws.

C.     Each Shareholder binds and obligates himself or herself, his or her spouse, his or her estate, and all persons claiming by, through or under him or her to the provisions of the Corporate Documents.

D.     Paragraph headings used herein are for convenience only, and shall not be resorted to in the interpretation of these By-Laws.   Wherever the context so requires, a masculine term of reference shall include both the feminine and neuter, and a singular term or reference shall include the plural.

E.     If any portion of these By-Laws is held to be void or unenforceable, the remainder of the By-Laws shall nevertheless remain in effect.

F.     All notices provided for under these By-Laws shall be in writing, and shall be deemed sufficient if sent via registered mail to the last known address of the party to whom such notice is to be given.

G.     No amendment to these By-Laws shall become effective unless it shall be presented in writing and it has received the vote of 75% of the number of Shareholders (rounded upwards).

## ARTICLE VII - Officers

A.     The Board of Directors shall designate, from among its members, a Secretary, an Assistant Secretary, a Treasurer and an Assistant Treasurer.

- 25 -

B.     *Managing Director.*   In addition to the duties indicated in Article II (D)(2), the   Managing Director shall have, subject to the control of the Board of Directors, general charge and supervision of the business of the Corporation; he or she may sign and execute in the name of the Corporation, all authorized deeds, mortgages, bonds, contracts or other instruments, except as otherwise provided by the Certificate of Incorporation, these By-Laws, or by resolution of the Board of Director; and shall perform such other duties, as from time to time may be assigned to him or her by the Board of Directors.

C.     *Secretary*:   The Secretary shall see that all notices are duly given in accordance with the provisions of the By-Laws or as required by law; he or she shall be custodian of the records of the Corporation; he or she shall see that the corporate seal is affixed to all documents as may be necessary; and, shall perform all duties incident to the office of a secretary of a corporation and such other duties as from time to time may be assigned to him or her by the Board of Directors or the Managing Director.  In the event that the Secretary is not available, the Assistant Secretary shall exercise the duties of the Secretary.

D.     *Treasurer*:   The Treasurer shall have charge of and be responsible for all funds, securities, receipts and disbursements of the Corporation, and shall deposit or cause to be deposited in the name of the Corporation, all moneys or other valuable effects in such banks, trust companies or other depositories as shall from time to time be designated by the Board of Directors; he or she shall render to the Managing

- 26 -

Director and to the Board of Directors, whenever requested, an account of the financial condition of the Corporation, and in general, he or she shall perform all the duties incident to the office of the treasurer of a corporation, and such other duties as may be assigned to him by the Board of Directors or the Managing Director.  In the event that the Treasurer is not available, the Assistant Treasurer shall exercise the duties of the Treasurer.

### ARTICLE VIII - Transfer of Shares; Security Interest

A.     The shares of stock of this Corporation shall not be sold, transferred or assigned by any Shareholder, except for the sale to the Corporation pursuant to Section (B) below.  The shares of stock of the Corporation shall not, in any way be pledged, hypothecated or given as security for any obligation of any Shareholder or any other person.  Certificates representing stock of the Corporation shall include a legend to that effect.

B.     In the case a Shareholder is expelled from the Corporation, or in case of withdrawal for reason of death, permanent disability, voluntary withdrawal, or retirement, upon said occurrence, title and beneficial ownership to the shares of stock of this Corporation shall be immediately vested in the Corporation and the Corporation shall be obligated to make the appropriate payments provided for in ARTICLE III to the former Shareholder, or his or her estate, as the case may be.



## OFFICIAL TRANSCRIPT OF PROCEEDINGS

### BEFORE THE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

---

RE:

FIDDLER, GONZÁLEZ & RODRÍGUEZ, PSC    *  BANKRUPTCY NO.:17-03403  (MCP)
                                      *
    Debtor.                           *
                                      *
*********************************    CHAPTER 7

DEPOSITION OF MR. JOSÉ ALFREDO SILVA COFRESÍ

---

PLACE:    San Juan, Puerto Rico

DATE:     March 13, 2019

# Crespo & Rodríguez, Inc.

**Court Reporters**
Tel. (787) 706-5930 / 706-8018
Fax (787) 706-8217
PO Box 29002
San Juan, Puerto Rico 00929



34

1  Ejecutivo?

2       R    ¡Ea, diablos! En los distintos 'conferences' de

3  Fiddler, González & Rodríguez.

4       P    ¿Y las reuniones eran atendidas por alguna

5  secretaria o nadie que no era miembro del comité?

6       R    Solamente los miembros del Comité Ejecutivo.

7       P    ¿Y las decisiones que tomaban en el Comité

8  Ejecutivo cómo eran comunicadas a los otros miembros del

9  bufete?

10      R    Bajo la presidencia del señor Pedro Manzano es

11  cuando más trasparencia hubo en el bufete históricamente

12  y se le informaban a la Junta de Directores y luego tenían

13  que ir a la junta de socios.

14      P    ¿Cómo eran informadas las decisiones del Comité

15  Ejecutivo a la Junta de Directores?

16      R    Verbalmente, cuando nos reuníamos.

17      P    Verbalmente, okey.

18      R    Según mi mejor recuerdo.

19      P    ¿Los temas discutidos por el Comité Ejecutivo

20  siempre se discutían en persona?

21      R    Puede ser que en alguna ocasión, si alguien se

22  excusaba, podía participar por teléfono, pero en raras

23  ocasiones.

24      P    ¿El Comité Ejecutivo en algún momento se

25  comunicaba por e-mail?



68

| | |
|---|---|
| 1 | R     Cuando más transparencia hubo en Fiddler, |
| 2 | González & Rodríguez fue durante la presidencia de Pete |
| 3 | Manzano, cuando más transparencia. |
| 4 | P     ¿Y por qué me dice eso? |
| 5 | R     Porque antes no era así. |
| 6 | P     ¿Cómo cambió bajo el señor Manzano? |
| 7 | R     Todo el mundo tenía acceso a todo y él lo decía |
| 8 | en todas las reuniones, a todo, ahí no habían cuartos |
| 9 | oscuros y él hacía reuniones con la Junta de Directores, |
| 10 | muchos 'charts' y explicaba todo lo del bufete, cuentas a |
| 11 | cobrar, que había que cobrar, que había que buscar |
| 12 | clientes nuevos, ese tipo de cosas. Una persona bien |
| 13 | proactiva en difundir información, eso se lo puedo |
| 14 | asegurar, mirándolo a los ojos. |
| 15 | P     ¿Y en crear colaboración entre los socios, eso |
| 16 | era algo que el señor Manzano hacía bien? |
| 17 | R     Siempre, siempre. |
| 18 | P     Entonces, ¿por qué había esta condición tan |
| 19 | tóxica que usted... |
| 20 | R     Yo no usé la palabra tóxica... |
| 21 | P     No. |
| 22 | R     ...en ningún momento. |
| 23 | P     ¿Problemática? |
| 24 | R     No, no. |
| 25 | P     No. |



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

86

1   reduction can no longer effect or mitigate revenue loses".

2       R   Eso dice Altman Weil. Unjú.

3       P   ¿Usted estaba de acuerdo con esa declaración de

4   Altman Weil?

5       R   Con lo que yo estaba de acuerdo era con que se

6   redujeran los gastos lo más que se pudiera. Yo me reduje

7   mi salario voluntariamente, voluntariamente. Pete Manzano

8   se redujo su salario voluntariamente. No recuerdo ninguno

9   de los diez, que no aportaron capital, que se redujera el

10  salario. Nos quitamos los carros, nos quitamos los carros.

11  Nos quitamos de los clubes. Nos quitamos una serie de

12  beneficios para ayudar al bufete, pero no teníamos

13  cooperación sobre todo esos diez socios que no quisieron

14  aportar capital. Si esos diez socios hubiesen aportado ese

15  capital, a lo mejor otra hubiese sido la historia.

16      P   ¿Y en el momento que usted determina, si es que

17  lo determina, que estos socios no van a aportar capital,

18  qué otras consideraciones o qué otras alternativas, mejor

19  dicho, consideraron para estabilizar la posición financial

20  del bufete?

21      R   No sé en qué época, pero nos bajamos los

22  sueldos, nos quitamos los carros, nos quitamos los clubes

23  y una serie de medidas duras.

24      P   ¿Pero cuando Altman Weil le dice que ya después

25  de varios años de reducir gastos...



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

87

1       R       Hay que seguir haciendo.

2       P       ...no se puede efectivamente mitigar las

3   pérdidas de revenido...

4       R       Bueno, a lo mejor eso estaba... no sé, es que no

5   sé cuál era el pensamiento de Altman Weil. Usted me puede

6   decir, no sé si para esa época fue que se perdió Doral, no

7   me acuerdo.

8       P       ¿Cuando se perdió Doral, qué hizo la firma para

9   tratar de atraer clientes nuevos?

10      R       Recuerdo que nos reunimos yo creo que en varias

11  ocasiones, se le pidió trabajo a Oriental. Sàbe, nosotros

12  éramos el inquilino más grande de Oriental, cuatro pisos

13  y nos quitaron el trabajo cuando BBV vendió a tu inquilino

14  más grande. Y constantemente yo sé que Pete Manzano iba a

15  buscar trabajo y Arline Bauzá también creo: "Mire, denos

16  trabamos, denos trabajo".

17      P       ¿Y tuvieron algún éxito buscando trabajo nuevo

18  de Oriental Bank?

19      R       Que yo recuerde, no, a lo mejor nos tiraron con

20  algunas migajas, pero nada sustancial, pero las gestiones

21  se hicieron.

22      P       ¿Y se hizo alguna otra cosa para tratar de

23  atraer clientes nuevos?

24      R       Oh, yo me comía la calle. Los socios, excepto

25  uno o dos en Laboral, se comían la calle buscando



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

88

1   clientes, dando seminarios, estando en asociaciones, como

2   en los Industriales, la Cámara de Comercio. Uno tiene que

3   ir a todos esos foros, porque ahí es que caen los clientes

4   nuevos.

5       P    ¿Los otros socios hicieron lo mismo?

6       R    Si todos hubiesen cooperado, otra hubiese sido

7   la historia. Yo puedo hablar por mí, yo me comí la calle,

8   como me la sigo comiendo.

9       P    ¿Y el Comité Ejecutivo qué hizo para imponerle

10  ese mismo tipo de requisito a los otros socios?

11      R    Pues  se  habló  de  un  PIP,  'Performance

12  Improvement Plan', pero hubo una resistencia increíble.

13  ¿Por qué usted cree que yo me sentía mal? Si yo estaba

14  haciendo todo lo posible por ayudar al bufete y Pete y

15  Enrique y Arline Bauzá y Pedro Vidal y había gente buena

16  en otras divisiones. Pedro Vidal, un Pedro Vidal, una

17  Arline Bauzá, un José Acosta en Litigio, sabe, el 50 por

18  ciento de los socios... Yo me sentía bien mal con eso, o

19  sea, yo viendo... dejando el pellejo, aportando dinero y

20  el 50 por ciento de tus socios...

21      Bueno, querían volver al 'lockstep', a antigüedad,

22  porque era tiempo de descansar y yo tengo 67 años y no

23  descanso. Cualquiera se siente mal. Usted hubiese hecho lo

24  mismo que yo.

25      P    Hay una página titulada 'Revenue Recapture',



95

1    P    Estas son recomendaciones que le dio Altman Weil

2    a la firma como cosas que podía hacer para incrementar la

3    posición financial de la firma. La primera era:

4    "Aggressively persuit contract to handle not performing

5    assets and lockdown estimate"'. ¿Qué hizo el Comité

6    Ejecutivo para ejecutar esa recomendación?

7    R    Yo no entiendo eso. No lo entiendo, eso.

8    "Aggressively persuit contract to handle not performing

9    assets and lockdown estimate". 'What is that'? ¿Qué es

10   eso?

11   P    ¿Cuando Altman Weil le entregó esta

12   presentación, usted le preguntó a Altman Weil qué

13   significaba eso?

14   R    Probablemente sí, pero no me acuerdo, hace tanto

15   tiempo de esto, no me acuerdo.

16   P    ¿Fue en el 2015?

17   R    2015, sí.

18   P    ¿Marzo del 2015?

19   R    'Expense reduction', sí, me acuerdo.

20   P    Okey.

21   R    Y 'Shareholder compensation' también, porque nos

22   bajamos los sueldos.

23   P    ¿Se bajaron todos los sueldos?

24   R    Yo me acuerdo que el mío se bajó y yo creo

25   que... según mi mejor recuerdo, se bajaron otros sueldos,



96

1    pero no me acuerdo ni a quién, ni cuánto, ni nada, no me

2    acuerdo.

3        P    '¿Immediately implement expense reductions', qué

4    hizo el Comité Ejecutivo para implementar esa

5    recomendación?

6        R    Según mi mejor recuerdo, los carros, la

7    gasolina, el mantenimiento, según mi mejor recuerdo, los

8    clubes, creo. Wao, hasta los periódicos se suspendieron,

9    se suspendieron las suscripciones, se suspendieron un

10   montón de cosas, pero según mi mejor recuerdo.

11       P    'Reduce Shareholder compensation', $900,000.00,

12   ¿eso se logró?

13       R    No recuerdo si eso se logró o no, pero se

14   trabajó, pero no recuerdo si se logró.

15       P    ¿Quién fue delegado de esa responsabilidad?

16       R    No recuerdo, pero... no recuerdo en verdad, no

17   te voy a decir un embuste, porque no recuerdo.

18       P    Y el cuarto punto: "Exercise departed

19   Sheraholder, deferral options to contractual the minimum?'

20       R    Me imagino que eso es pagar lo menos posible de

21   lo que había que pagarles una vez se retiraran.

22       P    ¿Y eso se hizo?

23       R    Se hizo, según mi mejor recuerdo, se hizo.

24       P    Hay una página titulada: 'To Do Post Triage', a

25   un par de páginas donde está usted.



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

97

1    R    Soy más malo buscando.

2    P    La primera recomendación fue: "Do not pay

3    Shareholders on balance on LOC."

4    R    ¿Qué es el 'LOC'? No me acuerdo.

5    P    'LOC' me imagino que es 'line of credit'. ¿Eso

6    se hizo?

7    R    Pasaban quincenas que no cobraban.

8    P    ¿Los 'Shareholders'?

9    R    Sí.

10    P    El segundo punto: "Reduce Shareholder payments,

11    10 percent of cash basis profits or retain annually to

12    straighten balance sheet", ¿eso se hizo?

13    R    Según mi mejor recuerdo, sí, se bajaron

14    beneficios, según mi mejor recuerdo.

15    P    ¿Pero se redujeron los pagos a los

16    'Shareholders' de la manera en que esto indicaba?

17    R    No sé si el 10 por ciento, pero sí recuerdo

18    algunos socios que recibieron... cuando vino el sistema

19    ese nuevo, que cogieron reducción de salario.

20    P    "Increase buying to 10 per cent of basic

21    compensation per year for three years witheld for each pay

22    check."

23    R    No entiendo qué es eso ahora mismo, no me

24    acuerdo.

25    P    ¿En algún momento consideraron levantar capital



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

99

1    P    ...lo entendió?

2    R    Sí. Tengo que haberle hecho preguntas sobre eso,

3    pero en este momento no me acuerdo. Yo hacía muchas

4    preguntas.

5    P    No fue hace tanto tiempo. Usted no tiene

6    problema de memoria, ¿verdad?

7    R    Que yo sepa, no.

8    P    Okey.

9    R    No sé si tengo Alzheimer o no, pero que yo sepa,

10   no.

11   P    Okey. ¿Cuando dice: "Significant contribution

12   absolutely necessary to have a seat at the table?"

13   R    Eso yo creo que se refiere, creo, a que los

14   socios que no produjeran, sabe, que tenían que... aportar

15   algo significativo o si no que...

16   P    Es obvio, por lo menos para mí, que la

17   recomendación de Altman Weil era que había que...

18   R    ¿Sacar gente?

19   P    ...sacar a los socios que no producían. ¿Qué

20   hizo el bufete para implementar esa recomendación?

21   R    Todo lo que se podía hacer, pero no teníamos los

22   votos, créame, todo. No teníamos los votos.

23   P    Yo no estaba ahí.

24   R    Sí, yo estaba, no teníamos los votos. Se

25   necesitaba el 75 por ciento. Era una camisa de fuerza.



100

1       P    ¿Consideraron alternativas corporativas para

2  cambiar ese requisito?

3       R    Para cambiarlo se necesitaba el 75 por ciento.

4  Bajarlo de 90, que era antes, a 75 fue un problema.

5       P    ¿Pero qué hicieron, levantar las manos y decir

6  "bueno, no podemos hacer nada"?

7       R    No, no. Nos inventamos lo del 'PIP', tratamos.

8       P    ¿Que no lo implementaron?

9       R   .No, la resistencia fue increíble, sobre todo la

10  gente que no trabajaba mucho.

11       P    Entiendo la resistencia, entiendo el punto de

12  que me ha dicho de la gente que no trabajaba mucho,

13  entiendo del que no quería cobrar, que no tenían en sí

14  para cobrar. A nadie le gusta cobrar, es pesado.

15       R    A mi me gusta, olvídate.

16       P    Ah, bueno. ¿Ustedes, el liderazgo de la firma,

17  el 'Executive Committee' y el presidente...

18       R    La Junta de Directores...

19       P    ...hicieron...

20       R    ...era parte del liderazgo.

21       P    ...hicieron algo más que levantar las manos y

22  decir: "Bueno, no podemos cambiar esta cultura de la

23  firma"?

24       R    No. Todo el tiempo estábamos tratando de decirle

25  a la gente que trabajara, que buscara clientes, eso era



102

1      R    Ya le dije todas las cosas que hicimos.

2      P    ¿Pero nunca intentaron de sacar a un miembro de

3    la firma?

4      R    Claro que intentamos y no conseguíamos los

5    votos.

6      P    ¿Se presentó una resolución?

7      R    Se discutió en el Comité Ejecutivo de cómo sacar

8    a la gente y no teníamos los votos.

9      P    ¿El Comité Ejecutivo en algún momento...

10     R    Es más, yo creo que se discutió, según mi mejor

11    recuerdo, hasta en la junta.

12     P    ¿En algún momento el Comité Ejecutivo le hizo

13    una recomendación a la Junta de Directores de identificar

14    a uno o más individuos para sacarlos como 'Shareholders'?

15     R    Según mi mejor recuerdo, sí.

16     P    Okey.

17     R    Sí, señor.

18     P    ¿A quién?

19     R    Carlos Padilla. Había una en Ambiental. ¿Me

20    puede dar los nombres de los socios, por favor?

21     P    Si pasa dos páginas más, ahí hay un listado de

22    los socios, por lo menos en el momento en que Altman Weil

23    entregó este reporte.

24     R    María Luisa González, Alberto Toro, que yo

25    recuerde, esos.



116

LCDO. SUÁREZ:

'I think yesterday we agreed it was the same. We, just went through it...'

DEPONENTE:

Bueno, lo que pasa es que yo no sé si son los mismos, porque...

LCDO. SUÁREZ:

'We can mark the one that...'

DEPONENTE:

Unjú.

LCDO. SUÁREZ:

P   ¿Qué causó en el 2011 que las minutas fueran... perdón, que los estatutos de la firma fueran reconstituidas o qué minutas... le sigo diciendo minutas, o qué estatutos nuevos fueron adoptados?

R   Déjame ver si recuerdo, pero... Una de las razones, según mi mejor recuerdo, es lo del 75 por ciento, que se bajó de 90 a 75 por ciento para tratar de salir de las batatas.

P   ¿De las qué?

R   Batatas.

P   ¿Qué es una batata?

R   Los que no trabajaban.

P   Ah, bien.

R   Esa fue una de las razones que yo me acuerdo, de



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

126

R    Unjú.

P    "The main function of the Executive Committee is to provide general direction, establish policy, and determine strategies to be followed by the Corporation, and to provide advise and recommendations to the Board of Directors. The Executive Committee is to insure that the Corporation provides legal services of the highest professional standards and at a reasonable cost to the clients." ¿Cómo descargaba el 'Executive Committee' ese deber?

R    En las reuniones del Comité Ejecutivo se establecían las políticas de búsqueda de clientes, de cobros y todas esas cosas y vamos... e íbamos, hablar correctamente, e íbamos con esas recomendaciones a la junta y la junta las aprobaba o no las aprobaba. Y eso de que... en eso éramos bien celosos de "insure that the Corporation provides legal services of the highest professional standards and at a reasonable cost to the clients", en eso éramos bien exigentes, bien exigentes.

P    ¿Las políticas que usted me acaba de mencionar, con qué frecuencia se revisaban esas políticas?

R    No eran mensualmente, pero era periódicamente, no me acuerdo el tiempo.

P    ¿Una vez al año?

R    Quizás más veces, dos veces, pero no me acuerdo



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.crespordriguez.com
Cel: (787) 449-1965 (24 horas)

127

1    muy bien, exacto.

2        P    Okey. En la Sección de 'Duties'.

3        R    'Duties'.

4        P    Sección 3: "Duties. To the extent permitted by
5    law and subject to the authority of the Board of Directors
6    recognized by subsections (a) and (c) of Article 4.01 of
7    the Corporations Act, it is intended that the Executive
8    Committee shall be vested with the authority of the Board
9    of Directors necessary to take any and all actions which
10   are usual and customary in connection with the management
11   of the Corporation. The duties and authority of the
12   Executive Committee shall include the following."

13       R    Unjú.

14       P    "Coordinate the professional services rendered
15   by the Divisions with the objective of providing the
16   Corporation's clients with complete legal services of
17   excellent quality." ¿Cómo se descargaba el deber de
18   coordinar los servicios profesionales rendidos por las
19   divisiones?

20       R    Pues entras a las divisiones, se discutían en
21   relación a los clientes, cómo se debía llevar a cabo los
22   trabajos, si habían asociados o alguien que no estuviese
23   haciendo el trabajo, pues se despedían.

24       P    ¿Dentro de las divisiones?

25       R    Dentro de las... No, eso se discutía a nivel del



# OFFICIAL TRANSCRIPT OF PROCEEDINGS

## BEFORE THE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO



RE:

FIDDLER, GONZÁLEZ & RODRÍGUEZ, PSC    *BANKRUPTCY NO.: 17-03403 (MCP)
                                       *
     Debtor.                           *
                                       * CHAPTER 7
***********************************

DEPOSITION OF MR. PEDRO J. MANZANO YATES

PLACE:    San Juan, Puerto Rico

DATE:     March 12, 2019

# Crespo & Rodríguez, Inc.

Court Reporters
Tel. (787) 706-5930 / 706-8018
Fax (787) 706-8217
PO Box 29002
San Juan, Puerto Rico 00929



11

1    terminate what was known then as the proprietary

2    partners pension plan?

3         A     If "involved" means matters that were taken to

4    the Board of Directors, and to the board of

5    shareholders, yes.

6         Q     Did you have any management responsibility for

7    that pension plan at all?

8         A     No.

9         Q     And to what extent were you involved when that

10   matter was brought before the Board of Directors?

11        A     I listened to the information that was

12   brought, to the attention of the board, and to the

13   attention of the board of shareholders, and we voted on

14   certain matters.  I do not recall specific matters in

15   which we voted particularly; I cannot recall right.

16        Q     I understand.

17        A     But in general terms that was it; we were, we

18   were provided with information from Milliman Guyatt

19   (phonetic), I don't recall any -- what's that name?  I

20   think it's "Consultiva," people giving us opinion--

21        Q     Outside advisors?

22        A     Yes, yes.

23        Q     Concerning the management and decision to

24   terminate the pension plan?

25        A     Concerning the entire situation related to



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

14

1   issues, but with this pension plan issue, I think that's

2   when it got really bad.  Or began to get bad.

3        And that's, you know I haven't seen minutes,

4   regarding those discussions.  I'm just working out of

5   memory--

6        Q    I understand.

7        A    --and this was 2006, you know, so--

8        Q    It's a long time ago.

9        A    --I could be missing some information -- maybe

10  if I look at some minutes, or--

11       Q    Mmhm.

12       A    --or other documents, it could refresh my

13  memory, but I do recall, yes, there were conflicts, and

14  one of the initial conflicts was whether it had to be

15  terminated or not.

16       Some people immediately thought that it had to be

17  terminated; others thought that we could do something to

18  continue with that plan.

19       Q    What was your view of the plan?

20       A    It changed, it changed.  I... initially

21  believed that we should try to save it, but once I

22  realized it was not feasible, and based on the advice

23  that we were given, we -- I was for the termination of

24  the plan.

25       Q    Were there other shareholders that felt



31

| | |
|---|---|
| 1 | Q    That's all right. Mr. Bury was the general |
| 2 | administrator-- |
| 3 | A    Yes. |
| 4 | Q    --of the firm? |
| 5 | A    Yeah. |
| 6 | Q    And how long had he been there, by the time |
| 7 | that you became managing partner, had he been in the |
| 8 | firm? |
| 9 | A    Oh, yeah, he was the general administrator |
| 10 | before I was hired by the firm.  Some two or three |
| 11 | years. |
| 12 | Q    What were Mr. Bury's -- before you were hired, |
| 13 | in the 1990s-- |
| 14 | A    Yes.  He got, he got to Fiddler in the late |
| 15 | eighties or in, or in 1990.  I think it was in late |
| 16 | eighties. |
| 17 | Q    When you became Managing Director, Mr. Bury |
| 18 | reported to you? |
| 19 | A    Yes. |
| 20 | Q    You were responsible for supervising Mr. |
| 21 | Bury's work? |
| 22 | A    I was -- I supervised Mr. Bury's work, and he |
| 23 | was the general administrator.  He had, in the |
| 24 | administration department -- he had, I mean, there were |
| 25 | certain areas where I would pretty much leave Mr. Bury |



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

32

1   do whatever he understood had to be done.  That had to

2   do with the relationship with the banks, and with the

3   accounting firms.

4       Everything that had to do with the financial

5   aspects of it, Mr. Bury had a lot of weight there.

6       Q   And I think you said Mr. Bury -- you left him

7   to do what he understood had to be done?

8       A   I mean, I, I technically, there was a

9   supervision, he would tell me, and, I mean, we talked

10  about everything that happened in the firm, but I pretty

11  much delegated, in him the daily relationships with the

12  bank, because he had done it all his life, as an FGR

13  employee, and the matters related to financial

14  reporting, financial aspects, because he is, he is

15  trained as an attorney -- I'm sorry -- as an accountant.

16  He spent some years in public accounting.  And, for

17  years, he had handled the interactions with the

18  auditors; he had always handled them.

19      But I stepped in, whenever the auditors wanted to

20  meet.

21      Q   Were there ever any issues with Mr. Bury's

22  performance?

23      A   None that were documented.  I mean, that's a

24  very, very, very broad question.

25      Q   I understand.



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

37

1      Q    What were those?

2      A    In two thousand... again, working from what I

3  remember right now -- I'm trying to give you the best

4  information I can give -- in 2015, early 2015, we had

5  been anticipating some takeover by the FDIC of Doral

6  Bank, which was a huge client of ours.  At a given

7  point, it produced almost $4 million per year.  So that

8  -- by that time it had reduced that level of work -- but

9  it was still a significant client.

10      There were rumors and issues regarding a possible

11  takeover by the FDIC, and it did happen in, in the -- I

12  think it was the first quarter of 2015 that the FDIC

13  took over, and closed Doral Bank -- we contacted, around

14  that time, we contacted Mr. James Cotterman -- Jim is an

15  advisor, and a consultant, on law firm management, and

16  finance.

17      We had dealt with him before.  He looked at our

18  financial documents, financial statements, financial

19  information, and he interacted with Ken Bury to get all

20  the information, and he produced a report, and some

21  recommendations, that were discussed with the Board of

22  Directors.

23      The Board of Directors was allowed to ask as many

24  questions as they had to Mr. Cotterman.  He answered all

25  the questions, and then we discussed the



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

38

1    recommendations.

2        And based on that, you know, based on the

3    possibility of reduced business, and a significant

4    reduction in cash flow, so we eliminated many of the --

5    some of the packages, or modified some of the packages

6    here, some of the benefits.

7        The car lease was eliminated, and the car lease was

8    eliminated, meaning that Fiddler would no longer pay for

9    the lease.  However, there were some people who had

10   their cars, or received their $14-plus hundred thousand

11   dollars, or their $1400 per month.

12       Some of us had leases.  Fiddler was the one who had

13   the lease.  And what was decided was that you could

14   either get financing from somewhere else, or Fiddler

15   would keep that lease, and the amount was reduced from

16   your salary.

17       So, Fiddler stopped paying for car leases.  There

18   might be some appearances that Fiddler was paying the

19   lease, but it was being deducted from the salaries.

20       The same thing happened for the allotment for auto

21   repairs; it was eliminated.  The gasoline was

22   eliminated.  Auto insurance was kept, it remained.  Life

23   insurance, I think it was... it stayed.  Health

24   insurance, we had even -- previous, to the 2015

25   measures, which we called "the triage."



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)



C. CONDE & ASSOC.
LAW OFFICES
254 SAN JOSE STREET
SUITE 5
SAN JUAN, PUERTO RICO 00901-1523
TELEPHONE (787) 729-2900
TELECOPIER (787) 729-2203
E-mail: condecarmen@condelaw.com

August 20 th, 2018

David C. Cimo, Esq.
Marilee A. Mark, Esq.
Cimo Mazer Mark PLLC
100 S.E. 2nd Street, Suite 3650
Miami, FL 33131
Tel: (305) 374-6482
Fax: (305) 374-6488
Email:  dcimo@cmmlawgroup.com
        mmark@cmmlawgroup.com

Paul J. Battista, Esq.
Gregory M. Garno, Esq.
Genovese Joblove & Battista, P.A.
100 SE 2nd Street, 44th Floor
Miami, FL 33131
Tel: (305) 349-2300
Fax: (305) 349-2310
Email: pbattista@gjb-law.com
       ggarno@gjb-law.com

                    Re:   In re Fiddler, González & Rodríguez, PSC
                          Main Bankruptcy Case No. 17-03403-MCF;
                          Chapter 7 United States Bankruptcy Court;
                          District of Puerto Rico

Dear Sirs:

I am in receipt of your demand letter dated July 5, 2018.  I am responding on behalf of José A.
Silva- Cofresí, Esq., Pedro J. Manzano-Yates, Esq., Enrique R. Padró-Rodríguez, Esq., Rosa M.
Méndez-Santoni, Esq. and Carmen R. Juarbe-Montijo, Esq., all of whom I represent.

I find it troublesome, negligent and appalling that, after allegedly conducting a thorough
"investigation" into the activities of some of Fiddler, González & Rodríguez PSC's former
officers, directors and/or shareholders or managers you sent my clients a letter bristling with
fictional, defamatory and outrageous general allegations based  on incorrect facts and devoid of
any applicable legal frame to sustain your allegations.   Your letter is replete with factual errors
regarding information that was easily verifiable with minimal effort.  For example, your letter

identifies Carmen R. Juarbe-Montijo as a member of the Board of Directors and/or the Executive Committee, when in fact, Ms. Juarbe-Montijo was *never* a member of either the Board of Directors or the Executive Committee of Fiddler, González & Rodríguez PSC. Likewise, your letter names some Shareholderswho ceased working for Fiddler, González & Rodríguez PSC prior to June 2011 – *almost 6 years prior to the petition date.*

As you should know, 11 U.S.C. § 105(a) allows the bankruptcy court discretion to issue any order, process or judgment necessary to prevent an abuse of process. This includes the authority to impose sanctions based **on bad faith, which "exists where an attorney knowingly or recklessly raises a frivolous argument."** In re Porto, 645 F.3d 1294, 1303 (11th Cir.2011). Likewise, a defendant may file suit for attorney costs and fees against a bankruptcy trustee and his/her attorneys when the trustee knowingly brings forth an adversary proceeding lacking any factual or legal merit, thus, incurring in unreasonable and vexatious litigation. In re Porto, 645 F.3d 1294, 1302–03 (11th Cir. 2011); *see also,* In re CK Liquidation Corp., 321 B.R. 355, 362 (B.A.P. 1st Cir. 2005) (upholding fine in amount of $2,500 that bankruptcy court imposed sanction for party's filing of meritless motion, because it was based on a legal argument not warranted by existing law or legal theories that are plainly foreclosed by well-established legal principles and authoritative precedent). In order to provide you with the correct and complete facts, given all the inaccuracies stated in your letter, which are clearly meant to harass and defame my clients, I am compelled to correct your account of the events that led to the filing of the petition in this case, so as to provide you with fair notice that any cause of action filed against my clients in this case, based on a "Breach of Fiduciary Duty" and/or "Avoidable Transfers" or any of the other theories posited in your letter, are entirely meritless and frivolous.[1i]  Below we provide you with an accurate and truthful account of the events in this case:

First, your letter states that in 2006 Pedro J. Manzano-Yates, Esq. (hereinafter referred to as "Manzano") assumed the role and position of Managing Partner of Fiddler, González & Rodríguez, PSC ( hereinafter referred to as "Fiddler"). **This is incorrect.**

*Manzano did not assume the role and position of Managing Partner until some years later. The evidence in your possession surely proves this fact.*

Second, your letter states that in 2014, due to the financial distress of the firm, caused primarily by "excessive spending", Manzano and others in Fiddler's Management determined that retirement of the Banco Popular Loan Facility was in the best interest of the shareholders, despite the fact that Banco Popular de Puerto Rico (hereinafter referred to as "BPPR") was one of the firm's largest clients. **This allegation is entirely inaccurate and false.**

*Fiddler had a line of credit with BPPR, not a "term loan", as alleged in your letter. In addition, the idea of obtaining a line of credit with Oriental Bank was not Manzano's , nor was it originated due to the firm's "financial distress" and/or "excessive spending". On the contrary, in mid-2012 Oriental Bank acquired Banco Bilbao Vizcaya's business in Puerto Rico*

---

[1]    I only address the facts exposed in your letter and reserve the right to address and correct any additional allegations that may be set forth during the litigation of this case. Additionally, I do not address any allegations or conclusions that do not make reference to and/or that are not based on facts.



*(hereinafter referred to as "BBVA"), Fiddler's biggest client at the time. Oriental approached Kenneth C. Bury (hereinafter referred to as "Bury"), the firm's General Administrator, and offered the firm a line of credit with more favorable terms than those in place with the line of credit it had with BPPR. Specifically, Oriental Bank offered Fiddler a line of credit that would use the firm's accounts receivables as collateral in lieu of personal guarantees, among other favorable terms. In accordance with his duties as General Administrator,[2] Bury informed, and favorably recommended Oriental's offer to Manzano. Thereafter, also in accordance with his role and responsibilities as Managing Partner, Manzano presented Oriental's offer to the Board of Directors of the firm, who believed the terms of Oriental Bank's line of credit proposal to be a good business decision and in the best interest of the firm and its shareholders. The Board of Directors approved Oriental's proposal unanimously. Thus, Manzano did not cause Fiddler to enter into an agreement of any kind with Oriental Bank to obtain a line of credit with an ill purpose. This was solely the decision of the Board of Directors of the firm who, as previously stated, unanimously approved the decision. One of the primary reasons the Board of Directors believed that obtaining a line of credit with Oriental Bank was a good business decision, and in the best interest of the firm, was that Oriental Bank had recently purchased BBVA, a former and very significant client of the firm, who actually provided more business to Fiddler than even BPPR, and they believed this to be a good opportunity to strengthen the business relationship with Oriental Bank and have the bank continue to provide the firm with business, as BBVA had done in the past. Thus, the idea that Manzano and others in Fiddler's management caused Fiddler to obtain the line of credit with Oriental Bank so as to release themselves of any obligation to the firm and facilitate a plan to leave the firm, is offensive and entirely wrong. The evidence in your possession surely proves this fact.*

Third, your letter alleges that a capital raise was carried out in February 2014 to pay off the "loan" with BPPR. *Again, this statement is completely inaccurate and false.*

*No capital raise was undertaken at this time by Fiddler or its shareholders. As stated above, the decision to move to Oriental and pay off BPPR, was due to the business judgment of the Board at that time. Neither Fiddler nor its shareholders raised independent funds to pay off the BPPR line of credit .The evidence in your possession surely proves this fact.*

*The fact is that some of Fiddler's shareholders undertook a capital raise late in December 2014. The funds raised were used to lower the line of credit balance with Oriental Bank. It should be noted that Manzano and all the shareholders who eventually left Fiddler to work with him, including José A. Silva-Cofresí (hereinafter referred to as "Silva"), Enrique R. Padró-Rodríguez (hereinafter referred to as "Padró"), Rosa M. Méndez-Santoni (hereinafter referred to as "Méndez") and Carmen R. Juarbe-Montijo (hereinafter referred to as "Juarbe"), all contributed to these capital raise,[3] and Manzano not only contributed to the capital raise more than his corresponding share, but also made a $15,000.00 loan to another shareholder to*

---

[2]    At the time, Mr. Bury had been Fiddler's General Administrator for more than 25 years.

[3]    I assume that you are aware that some shareholders refused to contribute capital to the firm.

3



*assist him in contributing to the capital raise. The evidence in your possession surely proves this fact.*

**Fourth**, your letter alleges, in what is the most baffling and unbelievable of claims that "Manzano and other shareholders within his labor group" knew as of February 2014 that they had decided to leave the firm. *This claim is completely false and absurd.*

*Neither Manzano nor any of the shareholders who eventually left Fiddler to work with him (Silva, Padró, Méndez and Juarbe) planned or even contemplated leaving the firm as of 2014. Why would Manzano and the other shareholders who eventually left Fiddler participate in the capital raise the firm undertook in December 2014 if they were planning on leaving the firm? Why would Manzano contribute more than his corresponding share and make a $15,000.00 loan to another shareholder to assist him in contributing to the capital raise if he was planning to leave? Why would Manzano and the others reduce their salaries and agree to a substantial reduction in benefits if they had been planning to leave all along?*

**Fifth**, your letter also alleges that Fiddler was not accurately reporting its financial condition in its financial statements and that Manzano failed to adequately inform the other shareholders as to Fiddler's financial condition and as to decisions affecting the firm's financial situation. This allegation is blatantly false.

*Bury, his financial and administrative teams, and Fiddler's Certified Public Accountants were responsible for preparing the financial statements. Such financial statements were then provided to Fiddler's Board of Directors. The financial statements were always unanimously approved by the Board of Directors and as far as my clients are concerned, Fiddler's financial statements did not contain any omissions or misrepresentations. Also, it is entirely untrue that Manzano failed to adequately inform the other shareholders as to Fiddler's financial situation or as to decisions and measures taken with respect to the firm's finances. On the contrary, Manzano's administration was entirely transparent with the firm's shareholders in terms of the operational, administrative and financial dealings of the firm. Firstly, Bury, as the firm's General Administrator, together with his financial and administrative teams, would prepare a monthly operational report, detailing the firm's finances, costs and operations. This report was provided to the members of the Board of Directors on a monthly basis so as to keep them appraised as to the firm's state of affairs. In addition, Manzano repeatedly informed Bury that the shareholders had a right to request, examine and review the monthly operational report and make inquiries and suggestions with respect to the same and instructed Bury to provide the requested information to any shareholder who sought it. Several shareholders indeed made use of such right and requested and were granted access to the firm's monthly operation reports and any other financial or operational information that they requested to examine. Moreover, Manzano would meet with the shareholders, on an average of once a month, to update them on the firm's financial situation and plans. During said monthly meetings, Manzano presented the shareholders with the financial and operational information and analyses that Bury prepared and presented to Manzano. Clearly then, your letter's allegation in that Manzano failed to provide the shareholder with adequate information as to the firm's finances and that Manzano*

4



*knew that the firm misrepresented its financial information in the financial statements is wholly mistaken. The evidence in your possession surely proves this fact.*

Sixth, your letter alleges that reckless spending was rampant at Fiddler during 2015 in the form of extravagant expense accounts, bonuses, parties, fundraisers, charitable contributions, luxury car rental and club memberships. This allegation is patently false and erroneous.

*The evidence in your possession should clearly demonstrate that no such reckless and extravagant spending took place at Fiddler and specifically, not during 2015. Quite the opposite. The years 2014, 2015 and 2016 was characterized as a period of austerity at Fiddler. Specifically: (i) from 2010 to 2016, Fiddler's shareholders received only one (1) bonus; (ii) in 2015, the car allowance and/or car benefit was eliminated for all shareholders; (iii) as of 2015, all Fiddler employees, including shareholders, had to pay for half of their medical insurance plan costs out of pocket; (iv) in 2015, shareholders lost the benefit of the gas refill card; (v) all club memberships were terminated in 2015; (vi) Fiddler carried out several personnel reductions in force in its administrative staff and reduced the number of attorneys by attrition; (vii) charitable contributions were eliminated and/or reduced (only those that were considered to yield business were continued); (viii) several shareholders, including Manzano, Silva and Méndez voluntarily considerably reduced their salaries; and (ix) holiday parties and social events were either eliminated or reduced to minor low-cost gatherings that were held in the firm's conference rooms . It should also be noted that, between 2010 and June 30, 2016, no firm-sponsored fundraisers were held. In short, there was simply no reckless or extravagant spending underway at Fiddler during the years in question, as alleged in your letter.*

*Importantly, it should be noted that Manzano sought outside counsel from several sources to guide and validate the cost-saving measures that were to be implemented at the firm. Specifically, Manzano sought and obtained the advice and recommendations of Altman Weil, Inc., experts in providing management and administrative services to legal organizations and firms. Manzano even went so far as to attend a specialty seminar regarding law firm management to ensure that he was taking all the necessary steps to ensure and protect Fiddler's financial viability. Thereafter, Manzano and Bury, again acting in the firm's best interests, met with James D. Cotterman (Altman Weil, Inc. consultant) (hereinafter referred to as "Cotterman") to discuss measures to ensure Fiddler's financial viability after the loss of Doral Bank's business. Cotterman issued a written recommendation and report whereby he discussed, validated and endorsed all the measures undertaken by Manzano to cut costs and ameliorate Fiddler's financial situation. In addition, Manzano and Bury also sought the counsel of certified public accountants Eduardo González Green and Jerry de Córdova from Aquino, De Cordova, Alfaro & Co., LLP..*

*As can be clearly surmised, the notion that there was rampant and reckless spending at Fiddler during 2014-2016 or that Manzano was grossly negligent in managing the firm are baffling, absurd, completely unfounded and simply irresponsible.*

5

**Seventh**, your letter states that by February 2016, Manzano and the other shareholders knew or had reason to know that Fiddler had no realistic probability of continuing as a going concern. **This is simply not true.**

*None of the information Manzano received and reviewed from the Fiddler's Administration and Finance Departments and the firm's accountants led him or should have led him to believe that Fiddler had no realistic probability of enduring. There were cash flow problems, but the data provided by the Administration Department showed that billings were greater than costs, there was not an insolvent scenario. Manzano and his administration always made significant efforts and implemented serious measures to reduce expenditures and maximize productivity and profit during a very difficult time for Fiddler and Puerto Rico, as a whole.*

As can be clearly surmised from the above-stated facts and information, your client simply lacks a valid cause of action against my clients in relation to Fiddler's bankruptcy petition, on the alleged incorrect facts.

Furthermore, I am sure you are   well-aware,[4] that claims against directors based on a breach of fiduciary duty under the Articles of Incorporation and Puerto Rico Law, for liability to attach under the duty of oversight, a plaintiff must show that the directors and/or officers' conduct was more egregious than grossly negligent and that they intentionally failed to act, despite a known duty to act.  This is a very high standard to fulfill under any circumstances, but, in this case in particular, you must be aware that the true facts and the evidence do not support such standard for your client to establish a cause of action on breach of fiduciary duty against my clients. Particularly, when all the evidence points to the fact that not only did my clients faithfully fulfil their responsibilities as Directors of Fiddler,[5] but also, they clearly went above and beyond the call of duty, taking unprecedented measures to improve the firm's finances and long-term viability.

Accordingly, please consider this notice that any cause of action filed against my clients in this case, based on cause of action relating to Fiddler's bankruptcy petition, is entirely meritless, defamatory and frivolous.  Thus, should you insist in pursuing any such actions against my clients, after knowing that such allegations are false and unsupported by any evidence, we will be forced to seek the imposition of legal sanctions under Federal Bankruptcy Rule 9011 against both you and your client, as well as seek any other remedies under Puerto Rico and Federal Law for what would constitute reprehensible unethical conduct and a clear abuse of the legal process meant to harass and defame my clients.  It should also be noted that my clients are not waiving any rights to a claim for damages, due to your unsustain allegations and the impact in the legal community in Puerto Rico against my clients.

Your letter to Liberty International is a clear attempt, albeit a frivolous and feeble one at best, to strong-arm my clients' insurance carrier to negotiate a settlement amount under erroneous

---

[4]      I surmise that, as part of your investigation, you and your client obtained copy and must be in possession of Fiddler's certificate of incorporation.

[5]      With the exception of Juarbe, who was never a Director at Fiddler.

6



facts and allegations.  Be advised that my clients have no intention of settling your ludicrous, outrageous, false, defamatory and baseless claims, for which we know you lack any evidence.  I suggest that you immediately place on notice any and all insurance carriers, which provide or may provide coverage for your and your client's wrongful acts, including unethical conduct, and any monetary damages that may arise from a Court order imposing sanctions, costs or any other monetary remedies.  I also request that you provide me, on behalf of my clients, copy of any such insurance policies within the next ten (10) days.

Sincerely,

Carmen D. Conde Torres, Esq.

## OFFICIAL TRANSCRIPT OF PROCEEDINGS

EXHIBIT

Blumberg No. 5110

7

## BEFORE THE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

---

**RE:**

FIDDLER, GONZÁLEZ & RODRÍGUEZ, PSC   *   BANKRUTCY NO.:
                                      *
        Debtor.                       *   17-03403 (MCP)
                                      *
************************************   CHAPTER 7

DEPOSITION OF MR. JOSÉ JULIÁN ÁLVAREZ MALDONADO

---

**PLACE:**   San Juan, Puerto Rico

**DATE:**    February 28, 2019

## Crespo & Rodríguez, Inc.

Court Reporters
Tel. (787) 706-5930 / 706-8018
Fax (787) 706-8217
PO Box 29002
San Juan, Puerto Rico 00929



72

1       Q     He resigned as managing director?

2       A     I mean, my recollection is that he resigned.

3 He was forced to resign, because the pressure was

4 pushing him. But I think he resigned. And when he

5 resigned, all of the, all of the shareholders from the

6 Labor Division, plus Arline Bauzá and -- Arline Bauzá,

7 uhhh... and later on Pedro Vidal also resigned from the

8 Board.

9       Q     Why was Manzano forced to resign?

10       A     Uhhh... there was an incident in a restaurant

11 called Laurel who, that there was located at the Puerto

12 Rico Museum, very close to here, and -- I was not there,

13 so I cannot tell you for a fact that this is what

14 happened, but -- this is, what I am going to tell you is

15 what people in the halls talked about. Okay?

16       Q     Understood.

17       A     Okay. Apparently, Manzano was there with

18 Arline Bauzá and María Teresa Szendrey. They had lunch,

19 and then they had, they were drinking champagne, since

20 noon. Around eight o'clock at night, they were still

21 there -- and Carmen Rita Vélez Borrás, who was the, and

22 is still the in-house counsel for Grupo Ferrer Rangel --

23 went into the restroom with two of our former partners,

24 two or three of our former partners, who had left the

25 firm before, because I believe they, I believe they were



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

73

1 afraid of Manzano, or, or couldn't deal with Manzano, or

2 whatever, they had left the firm.

3   The story goes -- and I have to tell you this, in

4 order for you to understand what happened--

5   Q Understood.

6   A --the story goes that Juan Carlos Pérez Otero

7 had a disagreement with Carmen Rita Vélez Borrás, in-

8 house counsel for Grupo Ferrer Rangel, and took it, took

9 that disagreement, to that complaint to the president of

10 Grupo Ferrer Rangel, and that the president of Grupo

11 Ferrer Rangel, in that issue, sided with her in-house

12 counsel.

13   And because Juan Carlos went over her head to

14 complain about her, all the labor matters that were

15 handled by Juan Carlos Pérez Otero were given to another

16 firm.  I don't know which firm, but...  And in Juan

17 Carlos Pérez Otero's view, and Manzano's view, that was

18 a treacherous act, treason.  I don't know how -- well, a

19 client can do that, but anyway...

20   So, I tell you this because when Carmen Rita came

21 into the restaurant -- and this is, again, hearsay; I

22 was not there, prior to that, I was not called -- I am

23 told, I believe that that night Manzano called Ricardo

24 and told him, and if you talk to Ricardo, he will talk

25 about it -- but this was known throughout Hato Rey and



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.cresporodriguez.com
Cel: (787) 449-1965 (24 horas)

78

1    Q    In your opinion, was the firm's image in the

2    business community tarnished because of this incident?

3    A    Oh, yes.  You know, definitely. Something like

4    that had never happened in 85 years.  I was amazed that

5    no one in the newspapers, you know, mentioned it.  I was

6    amazed, or the gossiping TV shows that we have on the

7    island mention it.  I was glad that never happened, but

8    everybody knew about it.

9    Q    But it certainly got around to the business

10   community.

11   A    Oh, yes.  Yes.

12   Q    The same business community that Fiddler would

13   look to generate new relationships.

14   A    Yes.

15   Q    If Manzano controlled such a large percentage

16   of the Board of Directors, how was he ultimately forced

17   to resign?  Who brought the pressure to bear on him to

18   resign?

19   A    Well, no... we... I think -- again, I was not

20   part of that board, but I'm pretty sure that the members

21   of the Board of Directors were putting pressure in him.

22   And, and the shareholders also.  Uhhh... so, instead

23   of... We didn't want him to -- we didn't want him to

24   being expelled from the firm.  We just wanted him to

25   step down from managing director.





## OFFICIAL TRANSCRIPT OF PROCEEDINGS

### BEFORE THE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

RE:

FIDDLER, GONZÁLEZ & RODRÍGUEZ, PSC  *   BANKRUTCY NO.:
                                     *
    Debtor.                          *   17-03403 (MCP)
                                     *
***********************************   CHAPTER 7

DEPOSITION OF MR. JOSÉ ALBERTO SOSA LLORÉNS

PLACE:   San Juan, Puerto Rico

DATE:    March 1, 2019

## Crespo & Rodríguez, Inc.

**Court Reporters**
Tel. (787) 706-5930 / 706-8018
Fax (787) 706-8217
PO Box 29002
San Juan, Puerto Rico 00929



47

```
1          So, and in that sense, the enforcement of that

2     action would prevent clients' adequate representation,

3     mostly if that lawyer had a lot of information, and

4     knowledge of the client.  So, I think, partly, that's

5     why it's unenforceable.  And it wasn't ever enforced.

6          Q    When Manzano and his group left the firm, my

7     understanding is that they took with them a bunch of

8     clients.

9          A    I wasn't there, but that's what I understand.

10         Q    You were not at the firm when the Manzano

11    group left?

12         A    No; I left before.  I left -- my resignation

13    was May 13th, 2016, and I left May 20th.

14         Q    And they left a month later.

15         A    I don't know when they left, but I knew it

16    was, it was afterwards.

17         Q    When other shareholders left the firm, was

18    there ever a discussion to enforce that provision?

19         A    Not that I recall.  Not that I recall.

20         Q    You know about the incident of the Managing

21    Partner at the Museum?

22         A    I've heard different versions of it.

23         Q    Okay.

24         A    I received a call, it was in January 2016,

25    from him -- he explained me what happened, what just
```



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*

48

1   happened.   And what he told me was that, there was this

2   client at another table, and they had, let's say, a

3   disagreement, and a very forceful disagreement, in which

4   it became a little offensive.

5        Afterwards -- I think it was either within 72 or 48

6   hours -- the client requested all files of the firm.

7   And, as a result of that, one of our great lawyers left

8   the firm.

9        That client was going to follow that lawyer.  So --

10  and even if -- I don't think he would sign this, because

11  he wasn't a partner at the time we signed this.   It

12  wouldn't have been enforceable.

13       And prior to that, I don't think that nobody,

14  raised the level of concern, in order to enforce that.

15  Yeah.

16       Q    What caused Manzano to resign as Managing

17  Partner?

18       A    Many things.  But I would say that the

19  incident at the Museum accelerated.  He was due to have

20  an election -- I don't recall when was the date -- but

21  in my assessment he knew that he didn't have the votes

22  to be formally appointed.

23       And the issue -- that when this issue about the

24  Museum occurred, it was hard for the firm to continue to

25  have him as Managing Partner.





EXHIBIT
9

# OFFICIAL TRANSCRIPT OF PROCEEDINGS

## BEFORE THE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

RE:

FIDDLER, GONZÁLEZ & RODRÍGUEZ, PSC   *   BANKRUTCY NO.:
                                     *
        Debtor.                      *   17-03403 (MCP)
                                     *
*********************************    CHAPTER 7

DEPOSITION OF MR. CHARLES BIMBELA-QUIÑONES

PLACE:    San Juan, Puerto Rico

DATE:     February 27, 2019

# Crespo & Rodríguez, Inc.

Court Reporters
Tel. (787) 706-5930 / 706-8018
Fax (787) 706-8217
PO Box 29002
San Juan, Puerto Rico 00929



33

1    never had worked with the firm before.   He came in when

2    there was a change in administration, with the new

3    governor, García Padilla.

4         Q    Was there ever any discussion among the

5    shareholders as to whether Mr. Manzano had the authority

6    to enter into these agreements?

7         A    Yes.

8         Q    Was any action ever taken by the shareholders?

9         A    At one point in time -- at one point in time,

10   the Board of Directors, which I was not a member at that

11   moment, asked him to cancel the contract, because they

12   thought it was not valid.

13        And my recollection is that he told the Board of

14   Directors he was going to do it, but it went like a lot

15   of months, and he didn't do it.   And he kept on paying

16   the benefits and salary without -- with the specific

17   instructions from the Board of Directors to cancel it.

18        Q    Were there any other -- excuse me -- were

19   there any other instances where Mr. Manzano acted

20   without authority from the Board of Directors that

21   caused discussion at the firm?

22        A    Mmmm... well, after he left -- because at that

23   time, administrative matters were very close, after he

24   left -- I can recall, for example, we made what was --

25   the library at that time was remodeled to make a large



35

```
1        Q     '¿Estabilizados?'
2        A     'Estabilizados.'
3        Q     Stabilized.
4        A     Stabilized.
5        Q     What do you mean by "stabilized"?
6        A     The finances of the firm.  If we continued to
7   go ahead and keep the firm, and then we would consider
8   making any claims to other stockholders.
9        Q     Prior to Mr. Manzano's departure from the
10  firm, was there a discussion among the
11  stockholder/shareholders of the financial condition of
12  Fiddler?
13       A     Of the finance--
14       Q     Yeah, was the company in economic distress
15  before Manzano left with his group?
16       A     Uhhh... I think it was... it was starting to,
17  to come back, yes.
18       Q     Were you aware of a study conducted by the *
19  Altman Weil firm, Altman Weil, of Fiddler?
20       A     I know there was one, but I'm not familiar
21  with it.  So I don't know.
22            (Deponent is handed a document to review.
23       A     Most of this information was given by Mr.
24  Manzano in regular meetings with the stockholders, the
25  process was that he gave us some presentation, with a
```



58

1   some days before we were closed down.

2        Q    Did you review this letter, prior to signing

3   it?

4        A    I suppose I did, before signing it, sure.  But

5   I don't have any recollection about the letter, or the

6   discussion, or something...

7        Q    And prior to signing the letter, did you

8   review any documents, or conduct any diligence to

9   establish the accuracy of any of the representations in

10  this letter?

11       A    No.  I don't recall, I really don't recall.

12       Q    The letter dated May 9th makes a number of

13  representations on behalf of management for the firm--

14       A    Mmhm.

15       Q    --to its auditors, concerning its financial

16  statements, and information provided therein.

17       Would you have become familiar with the firm's

18  financial statements in order to prepare this -- in

19  order to sign this letter?--I'm sorry.

20       A    I really was not involved in the financial

21  matters at that time.  I don't recall going to the

22  specific information, and my making them; no.

23       Q    Who presented this letter to you for your

24  signature?

25       A    I don't recall.





## OFFICIAL TRANSCRIPT OF PROCEEDINGS

### BEFORE THE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

---

RE:

FIDDLER, GONZÁLEZ & RODRÍGUEZ, PSC   *  BANKRUPTCY NO.:17-03403 (MCP)
                                     *
     Debtor.                         *
                                     *
**********************************   CHAPTER 7

DEPOSITION OF MR. JOSÉ ALFREDO SILVA COFRESÍ

---

PLACE:   San Juan, Puerto Rico

DATE:   March 13, 2019

## Crespo & Rodríguez, Inc.

**Court Reporters**
Tel. (787) 706-5930 / 706-8018
Fax (787) 706-8217
PO Box 29002
San Juan, Puerto Rico 00929



40

1       P      ¿Y eran gastos?

2       R      Para beneficios del bufete y relacionados al

3    bufete.

4       P      ¿Su testimonio es que eran gastos a beneficio

5    del bufete?

6       R      Muchos de ellos, sí, beneficio... viajes,

7    seminarios podían ser.

8       P      ¿Y por qué se relacionaba eso a la compensación

9    y no a sencillamente tener a Fiddler reembolsando los

10   gastos del bufete?

11      R      No sé. Este sistema se inventó o se creó...

12   Digo, cuando yo llegué al bufete en el 1981 ya esto estaba

13   creado, esto no es nada nuevo. Esto lo creó creo que el

14   licenciado Salvador Casellas, que en paz descanse, y la

15   división de... creo yo, según me han informado, la

16   División de Derecho Tributario de Fiddler, pero yo lo...

17   Desde que yo llegué al bufete, esto existía, esto no se

18   creó ni hace dos años, ni hace tres.

19      P      ¿Y cuando usted fue miembro del Comité

20   Ejecutivo, en algún momento le indicó a la firma que sería

21   apropiado revisar la política de la cuenta de gastos?

22      R      Según mi mejor recuerdo, no, según mi mejor

23   recuerdo.

24      P      ¿Y en algún momento a usted le preocupó, le

25   causó algún tipo de inquietud que la cuenta de gastos se



Crespo
Rodríguez, Inc.
Taquígrafos de Récord
www.crespodriguez.com
Cel: (787) 449-1965 (24 horas)

51

1   años antes y la División Tributaria entiendo que fue quien

2   creó esto. Yo no estoy de acuerdo con que él conteste su

3   pregunta, porque presume una violación, lo que usted está

4   presumiendo, que no lo es, por lo que él ha testificado.

5   LCDO. SUÁREZ:

6       P    ¿Usted entendió mi pregunta?

7       R    No, verdaderamente no.

8       P    La verdad es que no la entendió. ¿Usted en algún

9   momento se preocupó con asegurarse que esta política era

10  legal?

11      R    Es que, vuelvo y le repito, eso nunca ni me pasó

12  por la mente, porque eso vino de tiempo inmemorial, de los

13  tiempos de Salvador Casellas, Rafael Vizcarrondo, ellos

14  fueron los... yo ni estaba en el bufete.

15      P    Ya. ¿Nunca se molestó en preguntar si era legal?

16      R    Yo no pregunté.

17      P    Okey, bien.

18      R    Yo reportaba lo que tenía que reportar.

19      P    Perfecto. Una pregunta más.

20      R    Unjú.

21      P    ¿Todos los otros socios mantenían una cantidad

22  de presupuesto bajo la cuenta de gastos inferior a la

23  suya?

24      R    No sé. ¿En qué año? Tantos años.

25      P    ¿En el 2013 o 2014?



56

1   LCDO. SUÁREZ:

2      'Alright.'

3   LCDA. CONDE:

4      'So, this was not a...' practiquita...

5   LCDO. SUÁREZ:

6      'Alright.'

7   LCDA. CONDE:

8      '...it was a practice for the...'

9   LCDO. SUÁREZ:

10      'This practice, okey, this practice.'

11      P   ¿Esta práctica que usted como 'Shareholder' de

12   la firma, por veinte años, lo objetó a esta práctica?

13      R   Eso estaba establecido en el bufete desde los

14   años inmemorables.

15      P   Okey.

16      R   Inmemorables.

17      P   Práctica del bufete desde los años inmemorables.

18   El documento número 22 que marqué ayer, por favor.

19      R   Ese documento es bien viejo, del 2005.

20   LCDA. CONDE:

21      'Have you seen this document before?'

22   DEPONENTE:

23      No. Yo no era ni parte del Comité Ejecutivo, según mi

24   mejor recuerdo. Yo nunca había... Rafael Cortés Dapena era

25   el socio a cargo de la División Corporativa, que tenía que



## OFFICIAL TRANSCRIPT OF PROCEEDINGS

### BEFORE THE

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO



RE:

FIDDLER, GONZÁLEZ & RODRÍGUEZ, PSC   *   BANKRUTCY NO.:
                                     *
    Debtor.                          *   17-03403 (MCP)
                                     *
***********************************   CHAPTER 7

DEPOSITION OF MR. JOSÉ ALBERTO SOSA LLORÉNS

PLACE:   San Juan, Puerto Rico

DATE:   March 1, 2019

### Crespo & Rodríguez, Inc.
**Court Reporters**
Tel. (787) 706-5930 / 706-8018
Fax (787) 706-8217
PO Box 29002
San Juan, Puerto Rico 00929



1  A    Yeah.

2  Q    Were those benefits reduced at any point in

3  time?

4  A    Yes.

5  Q    When were they reduced?

6  A    Two-fold.  At one point, depending -- and

7  other law firms do that here -- as part of your total

8  compensation, you could have it through, the Expense

9  Account--

10  Q    Mmhm.

11  A    --or have it as salary.  There were people

12  that pushed, as much as possible -- which I think it was

13  25 percent of their compensation -- in the Expense

14  Account.

15       The thing is that because of cash-flow issues, the

16  Expense Account wasn't being paid.  So, in practice, you

17  are reducing from a cash-flow perspective, that, because

18  most account -- most requests for payment of the Expense

19  Account were not being paid.

20       There were certain benefits, regarding clubs,

21  social clubs, the car -- the car was the biggest one...

22  Q    The car wash, the detailing --

23  A    The car, car wash, and insurance, all was

24  encompassed into one -- so, yes, those were, at one

25  point, not reduced, they were taken out all altogether,



69

1       yeah.

2           So, I know that -- before I left -- the issue was

3       compensation.  That the next step was, either firing

4       people; or reducing compensation.

5           Q    Was there discussions, either at the board

6       level, or at the Executive Committee level, at any point

7       regarding the Expense Account practices?

8           A    At one point, we couldn't continue to pay, it

9       was affecting the cash flow.

10          Q    It was strictly to the economic impact of the

11      Expense Account?

12          A    Yes.  And when the Doral situation came about,

13      the issue about the car, then it was explained, too

14      expensive to maintain, that we would have to take it

15      out.

16          Q    We discussed earlier ways that are practiced

17      in Puerto Rico that is different than in the States.

18          A    It is, mmhm.

19          Q    And the Expense Account practice, you

20      described, is common among the law firms?

21          A    Yes.  I would say that -- at least the big law

22      firms -- mostly it's the same.

23          Q    How did the Expense Account practice at

24      Fiddler work?

25          A    The thing is that -- the difference, I think



70

1   from Fiddler to other firms, had to do with the car.

2   Because for other law firms, the car is part of the

3   Expense Account.  So if you have a Toyota, you may have

4   a big Expense Account.  If you have a Bentley, you have

5   a small Expense Account.  And that was different,

6   because in Fiddler, the car was separate.

7       The issue about the Expense Account depended on the

8   lawyer, and the amount that it was thrown to the Expense

9   Account.  When I left, I had the minimum; the minimum, I

10  think it was $9,200 -- nine thousand something.  And

11  that's what I had every year, for an Expense Account.

12      And other people I know had 25 percent of their

13  compensation, and one of those, the compensation was

14  $300,000.  So, that's a hundred thousand dollar

15  compensation.  At least on my part -- and I can speak

16  for myself -- what I used the Expense Account, it was

17  related to the firm.  Essentially, travel, and,

18  seminars, books, and the like.

19      I didn't want not you calling me, but the Treasury

20  Department calling me because of uses of the Expense

21  Account, so that's why I had a small amount.  If I had

22  $100,000 in an Expense Account, I don't know how I can

23  justify it, all of that.  But that depended on lawyers.

24      And there was a practice among lawyers, as well,

25  not to use the Expense Account; that at the end of the



Crespo
Rodríguez, Inc.
*Taquígrafos de Récord*
www.cresporodriguez.com
*Cel: (787) 449-1965 (24 horas)*